STATE SAVINGS AND LOAN ASSOCIATION,
A CORPORATION, *v.* KAUAIAN DEVELOPMENT
COMPANY, INC., KAUAIAN LAND COMPANY, INC., ET AL.

No. 4590.

SEPTEMBER 27, 1968.

ABE AND LEVINSON, JJ., CIRCUIT
JUDGE KING IN PLACE OF RICHARDSON, C.J.,
DISQUALIFIED, CIRCUIT JUDGE DOI
IN PLACE OF MARUMOTO, J., DISQUALIFIED,
AND CIRCUIT JUDGE FUKUSHIMA,
ASSIGNED BY REASON OF VACANCY.

OPINION OF THE COURT BY LEVINSON, J.

This is the first case to reach this court involving a condominium. The statute under which we decide this case is the Horizontal Property Regimes Act, S.L.H. 1961, Act 180, as amended by S.L.H. 1962, Act 9 (hereinafter "H.P.R.A." shall mean Act 180 as amended by Act 9) .[1] The plaintiff, State Savings & Loan Association, brought this action to foreclose a mortgage given to it by Kauaian Development Co., Inc. (hereinafter "Corporation") to secure a construction loan. This appeal involves two distinct issues: State Savings' right to foreclose against the interests of purchasers of individual apartments and the right of persons claiming mechanic's and materialman's liens to foreclose against those interests.

I. State Savings' Mortgage

On May 17, 1962, Mr. and Mrs. Antone Vidinha, as seller, and Mr. and Mrs. Milo Marchetti, Jr., as buyer, entered into an agreement of sale relating to the fee of the land involved in this suit.[2] The Vidinhas retained legal title until the full price was

---

[1] The statute has been substantially revised, *see* R.L.H. 1955, as amended, §§ 170A-1 *et seq.*, and S.L.H. 1967, Act 244.

[2] In Hawaii, the term "agreement of sale" denotes an agreement binding the vendor to sell and the purchaser to buy real property. Normally, under such an agreement, the purchaser is entitled to immediate possession.

paid, but the Marchettis had the right to possession of the land. On August 29, the Marchettis leased the land to Mr. Marchetti, doing business as the Kauaian Development Company (hereinafter "Company"), for 55 years (hereinafter the lease will be referred to as "Master Lease 1").[3] Master Lease 1 was recorded in the Bureau of Conveyances on August 31, 1962. It required the Company to construct and have ready for occupancy within two years from the date of execution of Master Lease 1 all or a part of a hotel apartment complex conforming to plans approved by the lessor. The 55 year term was to begin

> when all or a part of the improvements are ready for occupancy as evidenced by written stipulation signed by Lessor and Lessee . . . .

On October 19, the Company recorded in the Bureau of Conveyances a document entitled "Declaration", which purported to submit the leasehold created by Master Lease 1 to a horizontal property regime. The document described the land covered by the lease and the book and page where it was recorded, the number, location, and area of the apartments to be constructed, and the general common elements of the structures to be constructed.

On February 8, 1963, the Real Estate Commission issued a "Final Report" pursuant to § 21 of the H.P.R.A. The report listed the Vidinhas as the fee simple owners of the land, indicated the existence of the agreement of sale entered into by the Vidinhas and the Marchettis, and listed Master Lease 1 as an encumbrance on the fee.

On August 2, the Corporation was formed. On the same day the Marchettis and the Company assigned their interest in the agreement of sale and Master Lease 1 to the Corporation.

On September 13, the Real Estate Commission issued a supplementary public report, as provided for in section 24 of the H.P.R.A., indicating that the Vidinhas owned the fee, that the agreement to sell the fee had been assigned to the Corporation,

---

[3]The lease was amended on March 10, 1963, and the amendment was recorded in the Bureau of Conveyances on May 13, 1963. The amendment is not significant to the resolution of the issues in this case.

and that the fee was encumbered by Master Lease 1 which also had been assigned to the Corporation.

On September 20, the Corporation recorded an amended declaration which, among other things, increased the number of units in the building to be constructed.

On November 12, the contractor wrote a letter to the Corporation confirming that construction had commenced on November 11.

On November 13, the Vidinhas conveyed the fee to the Corporation.

Between August 28, 1963 and November 19, 1963, the Corporation had executed 56 documents entitled "Contract of Sale" by which the Corporation agreed to sell and the purchasers agreed to buy individual units in the proposed buildings.[4] Each contract contained a clause providing for termination and return of the down payment in the event that construction was not commenced by December 31, 1963. The contracts also contained a clause indicating that the purchaser had received and read a copy of the Real Estate Commission's final report on the project.

After a loan commitment from Island Federal Savings and Loan Association of Honolulu for financing the individual purchases and construction of the buildings was withdrawn late in 1963, the Corporation entered into negotiations with State Savings for financing construction. Although State Savings' vice-president, J. Ralph Brown, expressed an interest in financing the individual units also, he made it clear from the outset that the Board of Directors in Salt Lake City, Utah, refused to commit State Savings to do so. The Corporation's vice-president and general counsel, Ralph E. Corey, accepted the construction loan with

---

[4]As distinguished from an agreement of sale, *see* note 2 *supra*, the contract of sale did not transfer the right to immediate possession. That right was to arise upon completion of construction.

The contract obligated the purchaser to pay 20% down upon execution of the contract and the remainder upon commencement of construction. The purchasers agreed to pay the balances of the purchase price "in cash and/or proceeds of a loan obtained by the purchaser from Island Federal Savings and Loan Association of Honolulu" upon commencement of construction.

Some of these contracts were cancelled by mutual agreement and the down payments refunded.

the clear understanding that State Savings was not committed to financing the purchases of the individual units.[5]

On January 17, 1964, the Corporation executed the mortgage on which this action is based to secure State Savings' construction loan to the Corporation of $800,000. The mortgage covers the land, all improvements in existence or to be built, and all rents or profits from the land or improvements. The mortgage was taken subject to the declaration. The mortgage neither mentions Master Lease 1 specifically nor refers to any contracts for the sale of individual units. State Savings had actual knowledge of the existence of such contracts when it took the mortgage.

Early in 1964, the Corporation hired an attorney to review all the existing documents relating to the proposed condominium project. In June, he informed the Corporation and State Savings that Master Lease 1 had been extinguished by merger and that the supposed horizontal property regime was at that time nonexistent.

On July 6, 1964, the Corporation created the Kauaian Development Land Company, Inc. (hereinafter "Land Corporation") , conveyed the fee to it, and became lessee from the Land Corporation for a term of 55 years to begin on the first day of business operation of the Hyatt House Kauai project (hereinafter this lease will be referred to as "Master Lease 2"). The deed conveying the fee to the Land Corporation states that it is subject to State Savings' mortgage.[6] Master Lease 2 contains a covenant by

---

[5]The evidence includes the letter committing State Savings to finance construction. Written in longhand and initialed by Corey and Brown is the following: "Subject to conditions in attached cable." It also contained the following in longhand:

Accepted: December 24, 1963
Kauaian Development Co., Inc.
By: Ralph E. Corey,
Its Vice-President

The cable referred to was also initialed by both Corey and Brown. It stated, in part, that the loan commitment

must state clearly that association [State Savings] is not committed in any way to make of [sic] subsequent condominium loans on all or part of this property.

[6]After January 17, 1964, the date on which the mortgage was executed, any transfer by the Corporation would be subject to the mortgage, R.L.H. 1955, § 343-49.

the Corporation that it will "observe and perform the terms and conditions of the mortgage, . . . and pay the loan secured by the mortgage." Master Lease 2 was never submitted to a horizontal property regime, except as it may be considered an amendment of Master Lease 1.

On July 29, 1964, the Corporation recorded the indentures of lease and leasehold condominium deeds demising and transferring to the purchasers their interest in the land and buildings. At the same time, individual mortgages and pledge agreements of these interests by the purchasers to the Corporation and assignments of the mortgages and pledge agreements to State Savings, not requested or accepted by State Savings, were recorded.

In August, 1964, the purchasers agreed to amend the contracts of sale.[7] Under the amendments the purchasers agreed to perform, pro rata, the terms of Master Lease 2.

Late in 1964, the Corporation and all but seven of the purchasers executed a document which purported to amend the leases and deeds and completely supersede the contracts of sale. It provided that the purchasers' interests in the individual units, as well as in the land and the common elements, were subject to State Savings' mortgage. The documents were executed at the request of Sheraton Corporation of America in anticipation of the latter's proposed purchase of the project which failed to materialize.

By the end of 1964, the Corporation was two months in default in payment to State Savings. Neither the Corporation nor any of the purchasers made any payments in 1965. State Savings filed its complaint to foreclose the mortgage on July 16, 1965.

The trial court held as follows: the declaration was the operative document submitting Master Lease 1 to a horizontal property regime, but the regime was destroyed when the leasehold merged in the fee; the contracts could not be specifically enforced and, therefore, they did not convey interests in real property; the purchasers' interests arose from Master Lease 2 which had never

---

[7]Copies of executed amendments were not introduced into evidence. The Corporation's president testified that to the best of his knowledge all the purchasers agreed to the amendments. There was no objection to this testimony, and no evidence to the contrary was introduced.

been submitted to a horizontal property regime; at the time State Savings received the mortgage, and at the time of the filing of the foreclosure action, the purchasers had no interest in the property. The purchasers appealed.

We disagree with the trial court's resolution of several issues. Although obscured by the proliferation of subsidiary issues and by protracted and often acrimonious exchanges between counsel, the issues presented are relatively simple. First, was a horizontal property regime established? Second, if a regime was established, what is the significance of such establishment? Third, what interest, if any, in the real property did the purchasers receive as a result of the contracts? Fourth, were any such interests subordinated to State Savings' mortgage? And fifth, did the purchasers establish any of their affirmative defenses?

### 1. Was a Condominium Established?
#### a. Background

The condominium, or horizontal property regime, is a recently-born creature of statute.[8] The origin of condominium ownership of land is the subject of considerable dispute.[9] It has been traced back to the Hebrews almost 2500 years ago.[10] The Hawaii statute, as were most of the early enactments, is based on a Puerto Rican statute.[11] Interest in condominiums has increased substantially since World War II in part because of housing shortages.[12]

---

[8]Hawaii was the first state to enact statutory provisions enabling the creation of condominiums, Kerr, *Condominium—Statutory Implementation*, 38 St. John's L.Rev. 1, 5 (1963); Ferrer and Stecher, 1 Law of Condominium iii (1967).

[9]*See* Berger, *Condominium: Shelter on a Statutory Foundation*, 63 Colum. L.Rev. 987, n. 5 (1963).

[10]Kerr, *supra* note 8, at 3.

[11]Sen. Stand. Comm. Rep. No. 1043, Sen. J. 1024-25 (1961). *See* Ferrer and Stecher, *supra* note 8, at 49, *et seq.*, for a discussion of the origins of the Puerto Rican statute.

[12]Leyser, *The Ownership of Flats—A Comparative Study*, 7 Int'l & Comp. L.Q. 31, 32 (1958). Important to the increased attractiveness of the condominium form was the enactment of section 234 of the National Housing Act, Housing Act of 1961, § 104, 75 Stat. 160.12 U.S.C. § 1715, which included condominium apartments within the Federal Housing Administration's mortgage insurance powers. No such provision was enacted to cover apartments in co-ops.

Act 180 was viewed as an enabling statute although horizontal subdivision might have been cognizable under common law.[13] Substantial impetus for the statute resulted from unpleasant local experience with cooperative apartments. Several millions of dollars were lost through loose handling of funds representing down payments on individual apartment units. Controls had to be developed in order (a) to protect the buying public, and (b) through a bolstering of public confidence, to create for the developer a better reception for his product. H. Stand. Comm. Rep. No. 622, House J. 937, 938 (1961). The H.P.R.A., as well as the statute in force today, is oriented toward protection of the purchaser. The more recent statute has eliminated many of the defects in the original statute, Act 180, which in part have given rise to this action.

### b. The Statutory Requirements

A horizontal property regime is created under the H.P.R.A. when a developer, sole owner, or co-owners declare their intention to do so by recording a master lease or deed and a declaration of submission which contains the following:

(a) The description of the land, whether leased or in fee simple, and the buildings, expressing their respective areas;

(b) The general description and number of each apartment, expressing its area, location and any other data necessary for its identification; and

(c) The description of the general common elements of the building. S.L.H. 1962, Act 9, § 8.

### c. Acts Taken in Compliance

Examination of Master Lease 1 and the declaration submitted by the Company indicates that the Company complied fully with the statute's requirements. The lease contained all necessary information and the declaration unequivocally stated the Company's intention to submit the leasehold to a horizontal property

---

[13]*Compare* H. Stand. Comm. Rep. No. 622, House J. 937 (1961), *with* Note, *Condominium: A Reconciliation of Competing Interests?*, 18 Vand. L.Rev. 1773, 1776 (1965), and Berger, *supra* note 9, at 1001-02.

regime. The statute requires no more. Therefore, a horizontal property regime was established.

## 2. What Was the Significance of the Establishment of the Horizontal Property Regime?

The trial court held that the declaration was the operative document creating a horizontal property regime and that it subdivided the declarant's interest in the land horizontally as well as vertically. We agree. Rohan & Reskin, *Condominium Law and Practice* § 3.02 (1967) ; Berger, *Condominium: Shelter on a Statutory Foundation,* 63 Colum. L.Rev. 987, 1004 (1963). But this is the beginning, rather than the end, of the inquiry. The statute provides that

> Once the property is submitted to the horizontal property regime, an apartment in the building may be individually conveyed and encumbered and may be the subject of ownership, possession or sale and of all types of juridic acts inter vivos or mortis causa, as if it were sole and entirely independent of the other apartments in the building of which they form a part, and the corresponding individual titles and interests shall be recordable. S.L.H. 1961, Act 180, § 4.

The statute makes the property *susceptible* to conveyance of individual units. It contemplates the existence of agreements transferring at least part of the developer's interest in individual units in the building before a person may assert an interest under the statute.

## 3. What Interests Did the Contracts Convey?

Since the declaration creates no rights in individuals other than the declarant, the purchasers must claim their interests under the contracts or subsequent documents. The majority of the contracts were executed before State Savings received its mortgage. Although they were never recorded, State Savings knew of their existence. On their face, the contracts contain many terms which regulate the rights of the parties. We disagree with the trial court's conclusion that the contracts did not convey

an interest to the purchasers superior to State Savings' mortgage.

State Savings argues that the contracts conveyed no interest superior to its mortgage on several grounds, and that even if they did, the purchasers subsequently subordinated any such interests to its mortgage. It asserts that the contracts were not binding at the time it took its mortgage, or, in the alternative, if the contracts were binding, they conveyed no interest in real property.

State Savings makes a two-pronged attack against the validity of the contracts. First, it cites section 23 of Act 180 which provides, in part:

> The developer shall not enter into a binding contract or agreement for the sale of any unit in a condominium project [until]
>
> (a) A true copy of the commission's final or substitute public report thereon with all supplementary public reports, *if any has been issued*, has been given to the prospective purchaser,
>
> (b) The latter has been given an opportunity to read same, and,
>
> (c) His receipt taken therefor.
>
> (emphasis added) .

State Savings argues that since the commission issued supplementary reports after it received its interest, the purchasers were free to avoid the contract and therefore the contracts were not binding. We disagree.

The section places a flat prohibition on any contracts for the sale of individual units until the commission has issued a final report. It also requires the developer to give all reports the commission has issued at the time the contracts are consummated to the purchaser. The commission is given the power under section 24 to issue supplementary reports where it deems additional information about the project should be made available to the public. We are unable to conclude that the legislature intended, thereby, to give the commission the power to make contracts invalid merely by issuing a supplementary report. The information disclosed in the supplementary report may be a basis on

which the purchaser could demand rescission of the contract, but this is quite different from holding ineffective all contracts entered into after a final report is issued but before optional, supplementary reports are issued by the commission.

Buttressing this conclusion is the different language used in sections 23 and 24. Section 24 requires the developer to issue a true copy of the supplementary report "to all purchasers". Section 23, which provides that contracts are not binding, requires a copy of all the reports to be given to each "prospective purchaser". Section 24 contemplates the existence of binding contracts and actual purchasers. In this case, the commission issued its final report on February 8, 1963, several months before the first contract was executed. Therefore, the contracts were not invalid simply because the commission chose to issue supplementary reports after the contracts were executed.

State Savings also contends that the contracts were not binding at the time it took its interest on the ground that the contract was to become effective only if construction was commenced by December 31, 1963 and that such construction was not in fact commenced by that date.[14] Construction was commenced on November 11, as evidenced by the contractor's letter to the Corporation. State Savings argues, however, that the condition was not fulfilled because the contractor testified that he intended to do only $15,000 worth of work, the amount of cash he had been paid at the time, and would do nothing more until financing was obtained. Regardless of the contractor's testimony of his intent, there is no such condition in the contract between the Corporation and the contractor, and furthermore, there is no evidence that there was any cessation of work after November 11. Funds were released from escrow on the basis of the November 12 letter and none of the purchasers contended in this case that the funds were released improperly.

---

[14]Paragraph 2, which refers to the escrow depository for the purchaser's 20% down payment, provides in part:

If construction has not commenced by December 31, 1963, all monies and documents shall be returned to the Purchaser, together with the accrued INTEREST, less an escrow service fee, and this agreement shall terminate and all obligations of the parties hereto shall be cancelled.

The fact that the contracts were binding does not resolve the further question as to the nature of the purchasers' interests under them vis-a-vis State Savings. Neither party has cited any authority to aid our determination of the kind of interest conveyed under the contracts and the statute.

Except as modified by statute with respect to registered land, *see Honolulu Memorial Park, Inc.* v. *City and County of Honolulu,* 50 Haw. 189, 436 P.2d 207 (1967), the proposition is well established that one who takes an interest in real property with knowledge of the existence of contracts of sale of other interests in the property is subject to the terms of the contracts, *Hurst* v. *Kukahi,* 25 Haw. 194 (1919). Furthermore, Hawaii recognizes the present transferability of interests in futuro which would have been invalid at common law, *Puukaiakea* v. *Hiaa,* 5 Haw. 484 (1885).

But the purchasers cite no authority, and we have found none, indicating that a contract for the sale of an interest in land and a building to be constructed on the land creates an equitable interest in the building superior to a mortgage securing a construction loan for the building. The two cases they rely on are inapplicable because they involved simple contracts for the sale of land. *Silva* v. *Desky,* 13 Haw. 307 (1901), involved the question whether the plaintiff could recover damages for breach of a contract for the sale of three lots where the only written memorandum of the alleged agreement was an instrument signed solely by the vendor. The court never referred to the existence of any equitable interests and no improvement was to be placed on the lots as part of the contract. *De Luz* v. *Ramos,* 31 Haw. 799 (1931), is even more inapposite. The issue involved there was whether specific performance of an oral agreement to make a lease could be enforced on the basis of part performance.

The cases State Savings cites are no more compelling. It erroneously cites *Merchants Collection Agency, Ltd.* v. *Ng Au Shee,* 32 Haw. 883 (1933) in support of its contention that the contracts conveyed no interest superior to its mortgage. In that case, the city attempted to avoid foreclosure of its interest in property mortgaged to the plaintiff on the grounds that before

the plaintiff took its mortgage it knew that the city was negotiating for the purchase of part of the real property covered by the mortgage. It was in that context that the court stated:

> [N]either actual nor constructive notice of intention to acquire realty nor of pending negotiations for a future sale of the same is sufficient to defeat a mortgage executed before the consummation of said sale. 32 Haw. at 892.

That case clearly did not involve an executed contract and therefore is inapplicable to this case.

State Savings, however, contends that since the contracts were not specifically enforceable they did not convey an interest in real property. We recognize that equity courts generally refrain from issuing decrees which they cannot enforce, *In re Kakina,* 5 Haw. 669 (1878), and that equity courts will not order acts requiring continuous supervision, such as construction of building, *cf. Paris* v. *Greig,* 12 Haw. 274, 279 (1899). But State Savings cites no authority which supports the conclusion that the inability, or refusal, of equity courts to grant a particular remedy indicates that no interest in real property has been conveyed. Recognition of an interest in real property does not necessarily depend on the availability of a specific remedy to protect such interests.

The question, then, is whether we ought to extend the protection equity historically has given to rights arising under an executory contract for the sale of land to interests of contract purchasers in a unit in a condominium to be built. Both parties agree that this case, and the issues involved in it, ought to be resolved in a manner which most effectively will implement the legislative desire to encourage the development of condominium projects in Hawaii. They disagree, obviously, as to the resolution which will best effectuate that purpose. The legislative enactment with which we are dealing in this case has profound social and economic overtones, not only in Hawaii but also in every densely populated area of the United States. Our construction of such legislation must be imaginative and progressive rather than restrictive.

We conclude that the overall objectives of the H.P.R.A. will best be effectuated by recognizing the rights of purchasers under the contracts as superior to those of a subsequent mortgagee receiving his mortgage with knowledge of those interests. First, equity courts long have recognized the basic unfairness of permitting a person to take an interest in property with knowledge that other interests, prior in time, exist, and permitting the subsequent interest to be free from those interests. As a general rule, a vendor can convey no more of an interest than he has at the time of the conveyance.

Second, and perhaps even more important, condominiums were developed as a method of ownership under which the individual purchaser's interest could be well protected. A significant part of the H.P.R.A. is devoted to ensuring that purchasers or potential purchasers will be well-informed of their rights and of the interests and liabilities they assume in purchasing a condominium unit. Obviously the purchasers cannot reasonably expect to receive their interests without paying for them or arranging for financing. Where an independent construction loan is necessary, it is a relatively small task to require the mortgagee to obtain subordination agreements from the purchasers as a condition of advancing the funds for construction. The burden cast upon the lending institution is light in comparison to the obvious virtue of this procedure in making clear to the unit purchaser his position. Undoubtedly this procedure would have been followed had State Savings hired an attorney to draw up the mortgage and advised him of the existing contracts of sale. It would be unconscionable for a lending institution to assume that it could ignore pre-existing contract rights. The additional step of obtaining subordination agreements is consonant with the legislature's desire to protect the purchasers and to enable them to keep informed as to their rights and obligations.

Concluding that a mortgagee advancing construction funds is subject to the interests of contract purchasers of the individual units in the structures to be built with those funds does not, how-

ever, mean that the purchasers cannot subordinate those interests to a subsequent mortgage.

State Savings argues that the purchasers, if they have any condominium interest, must rely for that interest on Master Lease 1. It contends that Master Lease 1 was extinguished by merger or by surrender and that the only document under which the purchasers could have had an interest at the time of foreclosure is Master Lease 2 which was never submitted to a horizontal property regime and which specifically subordinates that lease to the mortgage. We cannot agree that Master Lease 1 was destroyed by merger or surrender.

Under State Savings' theory, adopted by the trial court, merger occurred either on August 2, 1963, when the Corporation received the Company's interest as lessee and the Marchettis' interests as lessors and as purchasers under the agreement of sale with the Vidinhas, or, in the alternative, on November 13, 1963, when the Vidinhas conveyed the fee to the Corporation.

This court has recognized several times that the doctrine of the merger of estates is effective in Hawaii, *Foster* v. *Waiahole Water Co.*, 25 Haw. 726, 733 (1921); *Simerson* v. *Simerson*, 20 Haw. 57, 59 (1910); *but see Godfrey* v. *Rowland*, 16 Haw. 377 (1905), *overruled on other grounds, Parke* v. *Parke*, 25 Haw. 397 (1920). But this is the first case requiring an extensive discussion of various aspects of the doctrine. Legal and equitable estates merge at common law only when the estates are commensurate, *i.e.*, an equitable life estate and a legal remainder cannot merge, *In re Dickson's Estate*, 378 Pa. 48, 105 A.2d 156 (1954); *Donalds* v. *Plumb*, 8 Conn. 447, 453 (1831). On August 2, the Corporation had both the legal and equitable interest in the leasehold, but only had an equitable interest in the fee under the executory agreement of sale, and therefore merger was impossible.

By November 13, several contracts for the sale of individual units had been executed. At common law, merger does not occur where there is an intervening estate, but a contract right to lease property at some time in the future is not considered an intervening estate, *Logan* v. *Green*, 39 N.C. 370 (1846). Applying the common law strictly, the fee and the leasehold would appear to

have merged on November 13. We reject the principle that merger would occur despite the intervention of contract rights such as those present in this case. This court will not follow a common law rule relating to property where to do so would constitute a quixotic effort to conform social and economic realities to the rigid concepts of property law which developed when jousting was a favorite pastime.[15] Courts of equity have consistently refused to permit estates to merge where the effect would be to impair the rights of third parties, or where there is any reason to keep the estates separate, *Lantz* v. *Pence,* 127 Ind. App. 620, 142 N.E.2d 456 (1957); *Freier* v. *Longnecker,* 227 Iowa 366, 288 N.W. 444 (1939).

We do not go so far as to reject completely the common law doctrine of merger. We do, however, refuse to apply it to defeat the legally enforceable rights the purchasers obtained by virtue of their contracts.

Even were we to apply the general common law test of "the intent of the parties," we would reach the same conclusion. 1 Tiffany, *Real Property* 102 (3d ed. 1939). It would be nothing short of complete irrationality to presume that the Corporation, having succeeded to a condominium project based on a leasehold, desired to terminate the horizontal property regime merely because it also acquired the fee. On the contrary, every action it took after obtaining the fee was consistent with the conclusion that it intended Master Lease 1 to continue as an estate distinct from its interest in the fee.

---

[15]We are loathe to follow a rule of property law simply because it has been known from time immemorial. Although this court has recognized that courts may not be as free to reform the law of property as to reform the law of torts, Yoshizaki v. Hilo Hosp., 50 Haw. 150, 433 P.2d 220 (1967), there is increasing pressure for progressive decisions from the courts even in the area of the reform of property law. We are repelled, as is Professor W. Barton Leach, by the recognition that:

generation after generation of budding lawyers found themselves saturated with a set of rules of law, and particularly of land law, which had been developed through a long historical process to control the great baronial estates of England and not at all appropriate to the wilderness of New England, the convict colony of Georgia, or the slave plantations of Virginia. Leach, *Property Law Indicted* 10 (1967).

State Savings' argument based on the theory of surrender is no more persuasive. In view of the totality of the facts, it is impossible to conclude that the Corporation intended Master Lease 2 to supplant Master Lease 1. The Corporation continued to act as though it were the developer of a condominium project. An officer, and general counsel, of the Corporation testified that the creation of, and transfer of the fee to, the Land Corporation were necessary to take advantage of certain provisions of the state tax law. The Corporation never submitted Master Lease 2 to a horizontal property regime. Absent an indication that the Corporation intended to change the nature of the project, we must conclude that it regarded Master Lease 2 as an amendment to Master Lease 1. Even had the Corporation intended Master Lease 2 to supersede Master Lease 1, rights accruing to the purchasers under Master Lease 1 could not be affected without their consent. The record is devoid of any evidence to support the conclusion that the purchasers intended to surrender their interests in the horizontal property regime. We conclude that the record contains insufficient evidence to support the trial court's finding of the requisite intention to surrender Master Lease 1, *Peck* v. *Steere*, 23 Haw. 550 (1916) ; *Kamauleule* v. *Nagamoto*, 9 Haw. 384 (1894) ; *Davis* v. *Spencer*, 3 Haw. 274 (1871) .

4. Were Purchasers' Interests Subordinated
   to State Savings' Mortgage?

State Savings argues that the purchasers subordinated their interests in the land and individual units by virtue of the leasehold condominium deeds and indentures of lease or by the Sheraton agreement. The trial court made no finding on that issue. We do not sit as a trial court in this case. Therefore, the case must be remanded for determination of the issue of subordination.

5. Appellants' Affirmative Defenses

The purchasers argued that State Savings should be estopped from asserting its priority, if it had priority, that it waived its right to foreclose, and that it forfeited its right to foreclose. On

appeal, they further contend that the trial court failed to consider these defenses and thereby denied them due process of law.

### a. Estoppel

The appellants misconceive the nature of the doctrine of estoppel.

> "The rule of law is clear that where one by his words, or conduct, wilfully causes another to believe the existence of a certain state of things, *and induces him to act on that belief, so as to alter his previous position,* the former is precluded from averring against the latter a different state of things, as existing at the same time." *Molokai Ranch, Ltd.* v. *Morris,* 36 Haw. 219, 223 (1942), quoting *Pickard* v. *Sears,* 6 A. & E. (K.B.) 469, 475 (emphasis added).

The appellants introduced letters written by State Savings to the purchasers in which it referred to the latter as "Condominium Apartment Purchaser". The appellants failed, however, to introduce any evidence indicating how they relied to their disadvantage on those representations. Outside of limited correspondence, State Savings initiated no contact with individual purchasers. State Savings consistently indicated its unwillingness to commit itself to financing the individual units. If the purchasers relied on representations, they were representations by the Corporation's officers.

### b. Waiver

The appellants failed to establish facts to support their argument that State Savings waived its right to foreclose.

> Waiver is generally defined as "the *intentional relinquishment* of a known right," "a voluntary relinquishment of some rights" and "the relinquishment or refusal to use a right." *Robinson* v. *McWayne,* 35 Haw. 689, 719 (1940) (emphasis added).

> In general, unless it is express, it is shown either by such laches or by such inconsistent action as shows an intention not to rely upon the objection. For instance, moving for or

consenting to repeated continuances after opportunity to raise the objection might be regarded as sufficient laches, and joining in error or submitting or agreeing to submit the matter upon its merits might be sufficient action of an inconsistent character. *Territory* v. *Cotton Bros.*, 17 Haw. 374, 384 (1906).

The appellants argue that State Savings waived its right to foreclose when it failed to demand that the purchasers' rights be subordinated to the mortgage. It did not have the right to foreclose against the individual units until execution of the indentures of lease and leasehold condominium deeds in July 1964. We cannot conclude that a party waives a right by inaction several months before the right comes into existence. The right to foreclose did not arise until the Corporation defaulted on the loan secured by the mortgage. Any action or failure to act by State Savings before late 1964 is irrelevant to the issue of waiver. After the default, State Savings repeatedly warned the Corporation of the probability of foreclosure if payments were not made.

### c. Forfeiture of the Right to Foreclose

The appellants argue that State Savings should have accepted the tender of the individual mortgages or given the purchasers releases to enable them to obtain financing elsewhere. Although the appellants constantly refer to State Savings' obligation in equity to accept the tender, we find no factual basis to support the argument. The failure of the developers to finance the construction of the project properly is in no way imputable to State Savings. It took its mortgage under the terms specified therein. At the time the loan commitment was made, State Savings reiterated to the Corporation's vice-president and general counsel that it was not committed to financing the individual units.

If it was impossible for the purchasers to obtain financing, perhaps it was due to the manner in which the project was organized.

### d. Deprivation of Due Process

The appellants' argument that they were denied due process of law because the lower court failed to rule on their affirmative defenses is frivolous. The trial court carefully analyzed every

pertinent aspect of the case. It considered the conflicting arguments on all the fundamental issues and several which were tangential. Its failure to enter a specific finding on these issues, even if erroneous, would not justify reversal because the defenses were totally without merit.

II. Mechanic's and Materialman's Liens

On August 24, 1964, the architect sent a letter to the Corporation certifying that construction was substantially completed. The Corporation refused to publish and file the notice of completion even after the contractor's formal demand. On August 18, 1965, the contractor and a supplier filed notices of mechanic's and materialman's liens. The architect filed notice of its lien more than one year after, but within one year and 45 days from, the date of actual completion. The appellants asserted that the statutory liens were invalid for failure to file within the statutory period and that even if they were timely filed, they could not attach to the individual purchasers' interests.

### 1. Mechanic's and Materialman's Liens Under the H.P.R.A.

The appellants contend that the mere filing of the declaration prevented the liens from attaching to the interests of purchasers of the individual units. They do not refer to any provision of the statute and they do not cite any authority to support this broad assertion. The H.P.R.A. specifically provides that it is supplementary to all other provisions of the Revised Laws and that only laws inconsistent with the H.P.R.A. are repealed. It is silent on the subject of mechanics' liens, and therefore R.L.H. 1955, §§ 193-40, *et seq.*, is inapplicable only if, and to the extent that, it is inconsistent with the H.P.R.A.[16]

The only section which even arguably could be inconsistent with the enforcement of mechanics' liens is section 4 of Act 180 which is entitled "Status of apartments within an horizontal property regime". It provides:

---

[16]*Compare* the H.P.R.A. *with* R.L.H. 1955, § 170A-9(b), as amended (1965 Supp.) which specifically prohibited a mechanic's or materialman's lien from attaching to the individual units without consent of the individual owner.

Once the property is submitted to the horizontal property regime, an apartment in the building may be individually conveyed and encumbered and may be the subject of owner-ship, possession or sale and of all types of juridic acts inter vivos or mortis causa, as if it were sole and entirely independ-ent of the other apartments in the building of which they form a part, and the corresponding individual titles and interests shall be recordable.

We construe this section merely to make the individual units legal entities equivalent to a dwelling built as an individual struc-ture. It cannot reasonably be construed to give the condominium unit owner any greater interest than the owner of a single-family dwelling.

The law in Hawaii clearly gives a mechanic a lien on the improvement he constructs as well as on the interest of the owner of the improvement in the land, R.L.H. 1955, § 193-41. It is also clear that the mechanic's lien attaches to equitable interests aris-ing under a contract of sale, *Hofgaard & Co.* v. *Smith*, 30 Haw. 882 (1929). Applying those principles to this case, it is clear that the mechanics' and materialmen's liens attached to the purchas-ers' equitable interest.

### 2. Time for Filing

Mechanics' and materialmen's liens are creatures of statute. The statute provides that the lien does not attach unless a notice is filed in the specified office "not later than forty-five days after the date of completion". R.L.H. 1955, § 193-42. That section defines "date of completion" as the time when a notice of comple-tion or abandonment has been published and filed. It also pro-vides that where a notice of completion is not published and filed within one year after the actual completion or abandonment, the "date of completion" will be deemed to be one year after actual completion or abandonment.

Two of the lienors filed their notices of liens within one year after actual completion. They contend, however, that the refer-ence to filing "not later than forty-five days after the date of com-pletion" should be construed as setting only the outside limit on

filing and not as requiring filing during the forty-five day period. We agree.

Looking solely to the language of the statute, it is clear that the words "not later than" have reference only to the final date beyond which the notice may not be filed. The appellants argue that although the purpose of the statute is remedial in nature and therefore we should construe it liberally, it is also in derogation of the common law and therefore we should construe and apply strictly those parts "which prescribe for the completion or perfection of the lien." We agree that there is support for the proposition that procedural requirements should be applied strictly, *Lewers & Cooke, Ltd.* v. *Wong Wong*, 22 Haw. 765, 768 (1915) ; *Allen & Robinson* v. *Redward*, 10 Haw. 151, 159 (1895) ; *Lucas* v. *Redward*, 9 Haw. 23, 25 (1893). Nevertheless, the appellants cite no authority supporting their distorted construction. The only cases we have found which reject "premature" filing involve filing before the building was completed, *e.g., Birkemeier* v. *Knobel*, 149 Ore. 292, 40 P.2d 694 (1935). On the other hand, the Supreme Court of New Mexico has held, and we think wisely, that "within ninety days after completion" sets only the maximum time within which the notice may be filed, *Allsop Lumber Co.* v. *Continental Cas. Co.*, 73 N.M. 64, 385 P.2d 625 (1963). That court recognized, as we do in reaching our decision, that

> To hold otherwise would put upon a creditor a most onerous responsibility of determining the date of completion which might be difficult to ascertain with any degree of certainty. It might also delay for prolonged periods the time at which a lien could be filed, and then require that it be done precisely within the 90-day limitation period. No such meaning was intended, and *it would serve no beneficial purpose to make such a requirement. Supra* at 73, 385 P.2d at 630 (emphasis added).

We are not dealing with the rights of other creditors who might somehow be prejudiced by premature filing. This case merely involves a contest between the lienor and the parties against whom the lien is given by the statute. The purchasers advance

no convincing reason for the court to construe the terms contrary to their apparently clear meaning.

Affirmed in part, reversed in part, and remanded for further proceedings.

*Helen B. Ryan (Ryan & Ryan* of counsel) and *Milton W. B. Choy (Kim & Choy* of counsel) for certain defendants-appellants.

*James S. Campbell* and *Douglas E. Prior (Smith, Wild, Beebe & Cades* of counsel) for plaintiff-appellee.

*Ton Seek Pai (Okumura & Takushi)* for Better-Built Hawaii, Limited and Johnson & Rognstad.

*Norito Kawakami* and *Edward Stanwood* for defendant-appellee Kauai Commercial Company, Ltd.

*Tatsuo Asari for* E. F. Nilson, lien claimant, defendant-appellee.