ROBERT GREGG ANDERSON, Plaintiff, Cross-Defendant-Appellant, *v.* ANNE ANDERSON, Defendant, Cross-Plaintiff-Appellee

NO. 6028

OCTOBER 17, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY KOBAYASHI, J.

This is an appeal taken by appellant, Robert Gregg Anderson, former husband of appellee, Anne Anderson, from the Findings of Fact and Conclusions of Law, an Order on order to show cause issued pursuant to the Findings of Fact and Conclusions of Law (Order), and an order denying appellant's motion to reopen the proceedings or set aside the Findings of Fact and Conclusions of Law and Order issued by the trial court.

The Order, issued subsequent to a show cause hearing, required appellant to pay appellee one-half of the net proceeds from the sale of 3,187 shares of Amfac stock together

with interest thereon from April 19, 1972 to August 30, 1974, less the dividends overpaid to appellee on her share of such stocks. Appellee was ordered to use the proceeds to pay to the Bank of Hawaii $56,250.00 to liquidate the balance due on outstanding loan No. A5295. Appellant was further ordered to pay to appellee all interest which appellee would have paid on the balance of the loan, less any dividends received from and after August 30, 1974. In total, the net sum of $67,731.77, together with reasonable attorney's fees, was to be paid by appellant to appellee.

We affirm.

ISSUES

1.  Whether or not the court erred in construing paragraph 5 of the divorce decree as granting to appellee an undivided one-half interest in each share of Amfac stock held in the legal name of appellant.

2.  Whether the court erred in finding that appellee was not barred by the doctrines of waiver, estoppel, and laches to assert a claim to one-half the net proceeds of the 3,187 shares of stock sold by appellant in April, 1972.

STATEMENT OF THE CASE

Appellee and appellant were divorced on March 21, 1972. At the time of the divorce, 18,375 shares of Amfac stock were being held by appellant in his sole name. In paragraph 5 of the divorce decree and as part of the division of property of the parties, Judge Herman T. Lum of the family court of the first circuit (hereinafter referred to as the divorce court), made the following disposition of the 18,375 shares of stock:

> Plaintiff [appellant herein]shall continue to hold these 18,375 shares of Amfac stock in his name but as trustee for defendant as to 3,938 shares of that portion of such stock which is no longer considered option stock and as to

5,250 shares of that portion of such stock which is still option stock, until the same can be transferred and delivered to defendant free and clear of the notes due to Bank of Hawaii and, as to the 5,250 shares, past the holding period for option stock, which transfer and delivery shall be accomplished in cooperation with defendant and with her consent and approval, provided that plaintiff shall not be required to remain as such trustee for a longer period than five (5) years beginning and after March 1, 1972.

As between the parties, the stock held by plaintiff as trustee for defendant shall be subject to the payment of one-half of the notes due to Bank of Hawaii and the balance of the stock in plaintiff's name shall be subject to the payment of one-half of the notes due to Bank of Hawaii, and each shall hold the other harmless from any liability for amounts they are required to pay in excess of $141,000.00 individual liability, and plaintiff need not transfer or deliver any of the stock held by him as trustee for defendant unless and until he has been relieved of and from liability for a proportionate amount of the amount due to Bank of Hawaii.

Until such time as the defendant shall receive in toto either the 9,188 shares of stock or the proceeds of the sale of any portion or all of said stock, all dividends payable on said stock shall be the property of plaintiff and defendant in proportion to the number of shares held by or for the ultimate benefit of each. All dividend payment shall be used to pay the interest payments as and when they become due. It is contemplated that the interest payments will exceed the dividend payments and plaintiff will notify defendant of excess interest payments over dividends received. If defendant shall not reimburse plaintiff of this excess amount due within thirty (30) days, then plaintiff may withhold said amounts from defendant's alimony payments.

Should any tax be imposed by either federal or state governments because of the allocation to defendant of 9,188 shares of Amfac stock, this tax shall be the sole responsibility and liability of defendant, she holding

plaintiff harmless for any such taxes imposed because of this allocation.[1]

On March 1, 1973, appellee filed an order to show cause to compel appellant to transfer 3,938 shares of out-of-option stock to her pursuant to the terms of the divorce decree. The record does not indicate any action was taken on this order to show cause.

Appellee filed a second order to show cause on March 14, 1974, to compel appellant to pay to appellee half of the net proceeds of the sale of stock "on or about April 19, 1972" together with reasonable attorney's fees.[2]

On August 30, 1974, the Honorable Katsugo Miho, District Family Court Judge of the first circuit (hereinafter referred to as the trial court), held a show cause hearing, and pursuant thereto, filed the following Conclusions of Law:

1. Upon the entry of the Decree of Divorce on March 21, 1972, Plaintiff-Husband became a trustee of 9,188 shares of Amfac stock for the benefit of Defendant-Wife, to be held by him in accordance with the terms of the Decree of Divorce.

2. At the same time, each share certificate representing shares of stock in Amfac, Inc. which was registered in the name of Plaintiff-Husband, immediately became impressed with a trust in favor of Defendant-Wife of an undivided one-half interest therein, the Defendant-Wife having the beneficial ownership thereof, with the legal title being vested in Plaintiff-Husband.

3. As such trustee, Plaintiff-Husband had a fiduciary duty to earmark or segregate the shares so held by him in trust for Defendant-Wife.

---

[1] The language of paragraph 5 was drafted jointly by the two tax advisors, one representing appellee's interests, and one representing appellant's. It was incorporated into the divorce decree by the trial court.

[2] The March 14, 1974, order to show cause evidenced appellee's belief that the stocks sold by appellant in April, 1972, were part of the 5,250 shares of stock delivered to appellant by appellee prior to April 17, 1972.

4. Having failed to earmark or segregate any of the 9,188 shares held by him in trust for Defendant-Wife, the proceeds of the 3,187 shares sold by him on April 18, 1972, became impressed with a trust in favor of Defendant-Wife to the extent of one-half thereof, and Plaintiff-Husband owes Defendant-Wife the sum of $59,940.37, being fifty percent of $119,880.74 representing the net proceeds of the sale of 3,187 shares of Amfac stock together with interest paid by Defendant-Wife on the $56,250 balance on the Bank of Hawaii loan A 5295 from April 19, 1972 to the date of the hearing on this Order to Show Cause on August 30, 1974, in the sum of $10,325.04 for a total of $70,265.41. From this sum should be deducted a credit for dividends overpaid on the 3,187 shares in the sum of $2,533.64 through August 30, 1974, leaving a net sum owed her of $67,731.77. In addition, Plaintiff-Husband will continue to owe Defendant-Wife the amount of interest she pays on said Loan A 5295 from and after August 30, 1974, until the date of his payment of the foregoing sum of $67,731.77 less a credit for any dividends on 3,187 shares that may be hereafter overpaid until such payment as aforesaid.

.   .   .   .

6. Defendant-Wife is not barred by the doctrines of estoppel, laches or waiver in accepting dividends on 9,188 shares to the date of the Entry of an Order on Order to Show Cause.

At the hearing, the Judge orally dismissed the March 1, 1973, order to show cause.

STATEMENT OF FACTS

Of the 18,375 shares of stock, 12,250 shares were purchased by appellant, as an executive employee of Amfac,

Inc., as part of a stock option plan. Appellant exercised the options as follows:

| Q-3 | No. of shares | Total Option Price |
|---|---|---|
| Exercised 2-5-69 | 3,500 shares | $68,750.00 |
| Exercised 2-23-71 | 3,500 shares | 68,775.00 |

| Q-4 | | |
|---|---|---|
| Exercised 2-4-69 | 1,750 shares | 43,750.00 |
| Exercised 2-23-71 | 3,500 shares | 87,500.00 |

The stock purchases were financed through two unsecured loans from the Bank of Hawaii (Bank): a loan for $112,500, dated 2-5-69 (No. A5295), and a second loan for $170,000, dated 2-23-71, for a total indebtedness of $282,500. Both appellee and appellant were jointly and severally liable for payment of the two loans. Although the stocks were ineligible to be pledged as collateral for the loans at the time of purchase,[3] it was informally agreed between the Bank and the parties that the stocks would eventually be sold and the proceeds used to repay the loans. The remaining 6,125 shares of stock were acquired by appellant as a result of a 50% stock dividend issued on June 15, 1971, on the 12,250 shares.

The trust arrangement of the 18,375 shares of stock was made by the divorce court to avoid adverse tax consequences which the parties believed would result from an outright transfer of legal title to 9,188 shares to appellee. The tax advisors consulted by both parties agreed that if appellant were to transfer or sell any of the shares of stock within three years of the date the options were exercised, any gain on the transfer or sale would be taxed according to ordinary income rates. If the stocks were held for a period in excess of three

---

[3] The deposition taken of Wilson P. Cannon, Jr., President of Bank of Hawaii, indicates that this was due to Regulation Q of the Federal Reserve Board's rules and regulations.

years from the date of the exercise of the option, any gain would be taxed at the more favorable capital gain rates.[4]

At the time the divorce decree was entered, 5,250 shares of stock were eligible for capital gain treatment (hereinafter referred to as out-of-option stock). Since the 6,125 shares of dividend stock were subject to the same option provisions on which they were based, the trial court determined that 2,625 shares of the dividend stock were also eligible for capital gain treatment, making a total of 7,875 shares of out-of-option stock. The remainder of the 10,500 shares of stock (hereinafter referred to as in-option stock) would not be eligible for capital gain treatment until February 23, 1974.

Some time after the entry of the decree but prior to April 17, 1972, appellee had two certificates of stock, HU6190 for 1,750 shares of stock, and HU6191 for 3,500 shares delivered to appellant's secretary,[5] along with 1971 income tax form to be signed by appellant. Although the tax forms were returned to appellee shortly thereafter, appellee received no word of

---

[4] In evidence before the trial court was a telegram sent to Mr. Barlow, counsel for appellant, from Richard Griffith, tax advisor to appellant. The telegram cited section 425-C of the Internal Revenue Code as the section pertaining to tax treatment of option stocks which were transferred prior to expiration of the three year period pursuant to a property settlement or court order.

[5] A letter dated April 17, 1972, was sent to and received by Mr. Barlow, counsel for appellant, from Samuel P. King, counsel for appellee. The letter stated as follows:

As previously discussed, certificates number HU 6191 for 3,500 shares and number HU 6190 for 1,750 shares of the Common Stock of AMFAC, INC., both dated February 5, 1969, and both issued to and standing in the name of Robert Gregg Anderson, were delivered to Mr. Anderson's secretary for his signature and subsequent delivery to Bank of Hawaii in pledge as security for certain indebtedness to Bank of Hawaii.

It is understood that Anne Anderson has a beneficial interest in one-half of each certificate, as set forth in the divorce decree, and that this beneficial interest will be turned into actual ownership when, as and if she is able to make the necessary arrangements and makes written demand for such transfer or transfers.

the stock certificates.[6] The record shows that on April 17, 1972, appellant cancelled a certificate for 6,125 shares of Amfac stock and had three new certificates issued: one for 800 shares for sale to Amfac, Inc.; one for 2,387 shares for sale on the open market through E. F. Hutton & Company, Inc.; and one for 2,938 shares in the name of appellant.[7] Appellant received a total of $119,880.74 for the sale of 3,187 shares of stock to Amfac, Inc., and others through E. F. Hutton & Company, Inc. Appellant used part of the proceeds of the sale to repay his share of loan No. A5295 to the Bank. The record does not show what appellant did with the balance of the proceeds from the sale.[8] In a memo dated May 3, 1972, counsel for appellant notified appellee's counsel of the sale of 3,187 shares of stock.[9] Appellee was also made aware of the sale.[10]

The appellee made several attempts to have her share of the out-of-option stocks transferred to the Bank as collateral for her half of loan No. A5295 due.[11] She was unsuccessful.

---

[6] The certificates had been kept in a safe deposit box held in the joint names of the parties at the Bank, but shortly after the entry of the divorce decree, appellee had placed the safe deposit box in her sole name. The record shows that the remaining 7,000 shares of in-option stock have remained in appellee's possession in the safe deposit box until the present time.

[7] Testimony of Collin Blakely, Vice-President and Corporate Trust Officer for Bishop Trust Co.

[8] When asked what he did with the proceeds of the sale, appellant replied in his interrogatory: "Not applicable, per counsel."

[9] The memo stated as follows:
Your letter of April 17, 1972 is acknowledged.

. . . .

Incidentally, I thought you should be advised that Gregg sold 3,187 shares of Amfac stock and paid off his half of the $112,500.

[10] At the show cause hearing on August 30, 1974, Mr. King testified that he notified appellee of the sale of 3,187 shares of stock by appellant.

[11] Appellee wrote the following letter, dated May 22, 1972, and addressed to Judge Herman T. Lum, the judge who had issued the divorce decree of the parties:
Dear Judge Lum:
In compliance with the Decree referred to, I have not been able to have my

On July 27, 1973, stock certificates HU6190 and HU6191 were cancelled by appellant and two new certificates issued: one for 3,938 shares in the name of appellee, and one for 1,312 shares in the name of appellant.

## OPINION

I.    WHETHER OR NOT THE COURT ERRED IN CONSTRUING PARA-GRAPH 5 OF THE DIVORCE DECREE AS GRANTING TO APPELLEE AN UNDIVIDED ONE-HALF INTEREST IN EACH SHARE OF AMFAC STOCK HELD IN THE LEGAL NAME OF APPELLANT.

Appellant's primary contention is that the trial court erred in concluding that the trust arrangement of paragraph 5 of the divorce decree was an active trust, imposing on appellant the duties of a fiduciary. Appellant contends that the intent of the trial court was to create a "mere passive, custodial relationship whereby appellant was merely to hold legal title to 9,188 shares of stock for appellee" until the three-year hold period for the option stock had expired. We affirm the result reached by the trial court, although on different grounds.

In construing the terms of a divorce decree, the determinative factor is the intent of the court as gathered from the decree and other evidence. *Bowman v. Bennett,* 250 N.W.2d 47, 50 (Iowa 1977); *Hill v. Hill,* 3 Wash. App. 783, 477 P.2d 931 (1970). A judgment or decree like any other written instrument is to be construed reasonably and as a whole, *Smith v. Smith,* 56 Haw. 295, 301, 535 P.2d 1109, 1114 (1975), and effect must be given not only to that which is expressed, but

---

separate property, the 3,938 shares of Amfac stock delivered to Mr. Cannon at the Bank of Hawaii for collateral on my half of the original loan.

It is my desire to sell and pay off this note of $56,250.00 as soon as possible, but apparently I am not able to do so without asking the Court's assistance.

Would you please advise me as to what I am to do?

In a letter to Mr. W. P. Cannon Jr., President of Bank of Hawaii, appellee made the following request:

Since Gregg has paid off his half of the first loan, (loan No. A5295) will you, please, request him to send you, properly signed, the 3,938½ shares of Amfac stock, held by him in trust for me, for the purpose of collateralizing my note of $56,250.00.

also to that which is unavoidably and necessarily implied in the judgment or decree. *Pope v. Pope,* 7 Ill.App.3d 935, 289 N.E.2d 9 (1972).

The primary intent of the divorce court issuing the divorce decree, as evidenced from the language of the decree and other evidence, was to divide the 18,375 shares of Amfac stock equally between the parties, and, at the same time, avoid an outright transfer of legal title to 9,188 shares to appellee because of the tax consequences of transferring stock while the stocks retained their "option" characterization. Further, of the said stocks, 7,875 shares which were out-of-option were to be divided equally between the parties as were the 10,500 shares of in-option stocks. Other than the court's intent to make an equal distribution of the stocks, it is not clear whether the court intended that each share of stock be impressed with a trust in favor of appellee of an undivided one-half interest therein, or that the shares be segregated and earmarked by appellant into two separate groups of 9,188 shares each. What is clear and the trial court so found is that the appellee, after the entry of the decree of divorce on March 21, 1972, delivered to the appellant 5,250 shares of out-of-option stock with the express request that he endorse the same in order that the appellee could "give the shares to the Bank as collateral for the loan or to sell the shares and pay off the loan." Instead of doing so, the appellant retained the shares, sold 3,187 shares of Amfac stock, paid off his share of the $112,500.00 loan, and retained the rest of the proceeds from the sale. The total proceeds was $119,880.74, and his share of the loan was $56,250.00. The net effect of this transaction was that none of the proceeds of the sale went for the benefit of the appellee despite the fact that one-half of all the Amfac stock belonged to her.

We are of the opinion that the trial court's construction of paragraph 5 of the divorce decree was a reasonable one and one which effectuates the divorce court's primary intent. All the stocks were issued in the name of appellant, and all the powers incident to legal ownership accrued to appellant, such as the right to receive the dividends and to sell or transfer the stocks at will. In light of this and in light of the fact that

appellee's share and appellant's share of the stocks were so commingled at the time of the decree as to make it impossible for the trial court, in retrospect, after the appellant had already sold 3,178 shares of the stock, to determine whether such stock belonged to appellant or appellee, we think that the trial court properly exercised its equitable powers in reaching conclusion of law number 1. It logically follows, that since half of each share of the 3,187 shares of stock rightfully belonged to appellee, half of the net proceeds of the sale of such stock also can be claimed by appellee.[12]

II. WHETHER THE COURT ERRED IN FINDING THAT APPELLEE WAS NOT BARRED BY THE DOCTRINES OF WAIVER, ESTOPPEL AND LACHES TO ASSERT A CLAIM TO ONE-HALF THE NET PROCEEDS OF THE 3,187 SHARES OF STOCK SOLD BY APPELLANT IN APRIL, 1972.

Appellant contends that appellee's conduct of: (1) accepting the dividends on 9,188 shares of stock from March 21, 1972, through February 23, 1975; (2) remaining silent as to her claim to one-half the proceeds of the sale of stock for approximately two years from the time she had actual knowledge of appellant's sale of the stock until the time she filed an order to show cause to compel appellant to transfer one-half of the net proceeds of the sale of 3,187 shares of stock; and (3) requesting the transfer of 3,938 shares of stock on March 1, 1973, and accepting 3,938 shares in July, 1973, constitutes a waiver of appellee's right to claim the proceeds of the sale and justifies application of the doctrine of estoppel to appellee's claim.

A. *Waiver*

Waiver is generally defined as an "intentional relinquishment of a known right," a "voluntary relinquishment of

---

[12] We find it unnecessary to determine, for purposes of resolving this issue whether the divorce court intended to create a "passive" or an "active" trust. It is sufficient that the trial court's construction of the decree carries out the intent of the divorce court relative to the disposition of the 18,375 shares of stock. Hence, we express no opinion as to the correctness of conclusions of law numbers 2 and 3.

some rights," and "the relinquishment or refusal to use a right." *State Savings & Loan v. Kauaian Development Company*, 50 Haw. 540, 557, 445 P.2d 109, 121 (1968); *Robinson v. McWayne*, 35 Haw. 689, 719 (1940).

There is no dispute that appellee knew that appellant had sold 3,187 shares of Amfac stock in April, 1972. However, there is no evidence that appellee had knowledge, either actual or constructive, that any of the stocks sold belonged to her. Mere silence by the appellee as to her claim cannot be construed to constitute a release thereof. Waiver can take place only by the intention of the party and such an intention must be clearly made to appear. *Robinson v. McWayne*, *supra*, at 724. Appellee's acceptance of the dividends on 9,188 shares of stock does not clearly evidence an intention to waive appellee's right to claim that the stocks sold were as much her property as appellant's. The divorce decree required that all dividends received be used to pay the interest accruing on the Bank loan No. A5295. Merely because appellee permitted whatever dividends properly due her to be remitted to the Bank, it cannot be inferred that appellee intentionally waived her claim. Appellant never informed appellee which shares of stock were being sold. Since appellant had possession of all of the out-of-option stocks at the time, as well as a portion of the in-option stocks, appellee could not have known which certificates were being cancelled to effect the sale.

Appellee's request for transfer of 3,938 shares of out-of-option stock on March 1, 1973, and her acceptance of the certificate for 3,938 shares was also done without knowledge that 3,187 shares of stocks sold by appellee were commingled property. Appellant's claim of waiver is without merit.

### B. *Estoppel*

The doctrine of equitable estoppel is stated in *Molokai Ranch, Ltd. v. Morris*, 36 Haw. 219, 223 (1942), is as follows:

> The rule of law is clear that where one by his words, or conduct, wilfully causes another to believe the existence of a certain state of things, and induced him to act on that

belief so as to alter his previous position, the former is precluded from averring against the latter a different state of things, as existing at the same time.

Appellant contends appellee misrepresented to him that she did not know the whereabouts of 7,000 shares of in-option stocks, thereby preventing him from earmarking or segregating her share of the stocks. Therefore, appellant argues, appellee should be estopped from claiming a loss occasioned by appellant's failure to earmark or segregate her separate shares of stock. Since we did not find that appellant had a duty to earmark the stocks, this argument is no longer relevant. However, assuming, for purposes of argument that appellee intentionally or negligently deceived appellant into thinking that the stock certificates representing the 7,000 shares of in-option stocks were lost or not in her possession, there is no evidence that appellant was induced to rely on the alleged misrepresentation to his detriment. Presumably, none of the 7,000 shares of stock were eligible to be sold or transferred. Furthermore, there is no evidence that appellant requested appellee to deliver the stocks to him so that he could effect a separation of the stocks into equal portions.

The record fails to show how appellant relied on appellee's acceptance of the dividends on 9,188 shares of stock or by her delay in asserting her claim to half the net proceeds of the sale to his detriment. Appellant's liability on the loan ceased as of April, 1972, when he repaid the Bank for his share of the loan, whereas appellee has continued to pay interest on her share up to the present. Appellant has not claimed any detriment arising out of the fact that the dividends were used to pay appellee's half of the interest payments. Furthermore, appellant has refused to disclose what he has done with the proceeds of the April, 1972, sale of the stocks which was not used to pay the loan.

Appellant asserts that if appellee had asserted her claim to half the net proceeds promptly instead of delaying for two years, he could have sold additional stock to pay off the portion of his bank loan which he intended to pay off while the stock was still selling at $38.00 per share. However, there is no evidence on the record to support such an assertion. There

is no evidence of how many additional shares would have been sold or which loan would have been repaid. There is no evidence that appellant was justified in relying on the conduct of appellee as an acceptance of his claim to ownership of the 3,187 shares of stock sold. We cannot say that the conduct of appellee was "so inconsistent with the purpose of [appellee] to stand on [her] rights as to leave no opportunity for a reasonable inference to the contrary." *Robinson v. McWayne, supra* at 734.

As mentioned in the section of this opinion on waiver, appellee had no knowledge that the stocks sold were commingled property. As we said in *Robinson v. McWayne, supra* at 734: "Before [one] may be charged with knowledge it must appear that he possesses full knowledge of all the material particulars and circumstances and was fully apprised of the effect of the acts ratified and of his legal rights in the matter." There is no evidence that appellee was fully apprised of her rights in the matter.

Appellant cites the case of *Hartmann v. Bertelmann,* 39 Haw. 619 (1952), for the proposition that appellee's conduct evidenced an acquiescence in and consent to appellant's claim that all the 3,187 shares of stock sold were his separate property. The doctrine applied in that case was that of quasi-estoppel.

As defined in the case of *Hartmann v. Bertelmann, supra* at 628, quasi-estoppel is "a species of equitable estoppel which has its basis in election, waiver, acquiescence, or even acceptance of benefits and which precludes a party from asserting to another's disadvantage, a right inconsistent with a position previously taken by him." In that case, the court held that the beneficiaries of a testamentary trust were estopped from claiming damages to the trust allegedly caused by the trustee's failure to sell certain real property "within a reasonable time" as provided for by the will of the testator. The court found that the beneficiaries had contributed to the delay in the sale of the real property by their insistence that the property be sold for a price in excess of the price recommended by the trustee and the prices offered by potential purchasers.

· We can find nothing in the record which would lend support to a finding that appellee's conduct was so inconsistent with her present claim that, in equity, appellee should be estopped to make such a claim.

### C. *Laches*

Appellants contend that the doctrine of laches is applicable. We disagree.

The equitable doctrine of laches applies where "long acquiescence in the assertion of adverse rights has occurred", *Ishida v. Naumu,* 34 Haw. 363, 373 (1937), or when, "during inexcusable delay, the evidence has become obscured and, under the circumstances of the case, it is too late to ascertain the merits of the controversy." *Poka v. Holi,* 44 Haw. 464, 475, 357 P.2d 100 (1960); *Brown v. Bishop Trust Co.*, 44 Haw. 385, 355 P.2d 179 (1960). In order to invoke the doctrine of laches, if predicated on an allegation of acquiescence, the acquiescence must be based on a showing of express or implied knowledge on the part of the one to be estopped. *Dalton v. City & County of Honolulu,* 51 Haw. 400, 407, n. 4, 462 P.2d 199, 204 n. 4 (1969).

There is no evidence, in this case, that appellee knew or had reason to know that the stocks sold by appellant were partially hers. Under the circumstances, we do not think that appellee's delay in asserting her rights constituted "long acquiescence", nor was it "inexcusable."

We find that the evidence of waiver, estoppel, and laches insufficient to support appellant's claim.

Affirmed.

*A. William Barlow* for plaintiff, cross-defendant, appellant.

*A. Peter Howell* for defendant, cross-plaintiff, appellee.

### DISSENTING OPINION BY KIDWELL, J.

The majority opinion may well achieve an equitable result in this case, but the interpretation of the decree by which this

result is achieved is one in which regretfully I cannot concur. The decree said expressly that the trust res consisted of 3,938 shares of out-of-option stock and 5,250 shares of in-option stock. This part of the decree was drafted jointly by the parties' tax advisors, who presumably would have said that the trust was composed of an undivided one-half interest in 18,375 shares if that had been intended. In my opinion, the decree clearly expressed the intent that the trust be composed of the specified number of unallocated shares of the two classes of stock. Appellant was not by the decree deprived of control and disposition of the shares which were not in the trust.

The correspondence quoted in footnote 11 of the majority opinion may reflect an improper withholding by appellant from appellee of out-of-option shares held in the trust, which she desired to sell to liquidate her share of the bank loan. If appellee's rights were infringed by such withholding, the proper course is to determine and assess appellee's damages. But the circumstances described in the majority opinion do not support the conclusion that appellant disposed of appellee's property or is required to account to appellee for the proceeds of the sale of any shares.

I would reverse and remand this case for further proceedings to determine what liability, if any, was incurred by appellant as trustee of unallocated whole shares of stock held for appellee's benefit.