**SERVCO PACIFIC INC., a Hawai'i corporation, Plaintiff,**

**v.**

**Walter DODS, Jr., et al., Defendants.**

**No. CIV. 98–00272SPK.**

United States District Court,
D. Hawai'i.

March 8, 2002.

Paul Alston, Lea Hong, Peter Knapman, Alston Hunt Floyd & Ing, Honolulu, HI, for Plaintiff.

Charles Gall, Nathan H. Yoshimoto, Kobayashi Sugita & Goda, Honolulu, HI, for Defendants Walter A. Dods, Jr., David M. Haig, Fred C. Weyand, and Paul Mullin Ganley.

Patricia J. McHenry, Cades Schutte Fleming & Wright, Honolulu, HI, for Defendant City Mill Co., Ltd.

Benjamin M. Matsubara, Gary B.K.T. Lee, Curtis Tabata, Matsubara Lee & Kotake, Honolulu, HI, for Defendants Tripler Warehousing Co., Walter Chuck, Ray Lindsey, Kenneth Gatzenmeyer, and Hiram Kamaka.

David M. Louie, Jodie D. Roeca, Roeca, Louie & Hiraoka, Honolulu, HI, for Defendants George Kashiwa, Mildred M.Q. Chang, Steven H.K. Chang, George Chen Yang Wang and Co-counsel for Defendant Louis L.C. Chang.

James C. McWhinnie, Damon Key Leong Kupchak Haster, Honolulu, HI, for Defendants Robert V. Smith, Hamilton M. Ahlo, Osmose, Inc.

Janice T. Futa, Hisaka Stone Goto Yoshida Cosgrove & Ching, Honolulu, HI, for Defendant Jack B. Smith.

## AMENDED ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR PARTIAL SUMMARY JUDGMENT

SAMUEL P. KING, Senior District Judge.

This amended order incorporates changes as set forth in a separate order issued today. This order supercedes the order published at *Servco Pacific, Inc. v. Dods,* 106 F.Supp.2d 1034 (D.Haw.2000). The changes were necessitated by en banc proceedings on threshold issues in *Carson Harbor Village, Ltd. v. Unocal Corporation,* 270 F.3d 863 (9th Cir.2001) (en banc).

In this factually-intensive case, Plaintiff Servco Pacific Inc. ("Servco") moves for partial summary judgment against Defendants Walter Dods, David Haig, Fred Weyand and Paul Mullin Ganley, in their capacities as Trustees of the Damon Estate (collectively "Damon" or "Damon Estate"). The Damon Estate filed a corresponding counter motion for partial summary judgment against Servco. Defendant City Mill has filed a "limited joinder" in Servco's motion. The Tripler Defendants have joined in Damon Estate's counter motion. The Atlas Directors essentially take no position although they dispute some factual assertions.

For the reasons set forth to follow, the Court GRANTS the motions in part and DENIES them in part. Many disputed issues of material fact exist. In so doing, however, the Court makes some necessary declaratory rulings on several legal issues of first impression in the Ninth Circuit.

## I. INTRODUCTION

This case arises from environmental pollution at 2819 and 2841 Pukoloa Street ("the Property") located in the Mapunapuna area of Honolulu. Plaintiff Servco Pacific Inc. currently leases the Property from the Damon Estate. As the current lessee, Servco is in the process of a multimillion dollar clean-up. By this CERCLA action, Servco essentially seeks to apportion or shift the burden. Servco asserts CERCLA, breach of contract/warranty, contribution, subrogation, and indemnity-type claims against current and past owners, lessees, sublessees, and respective assignees.

Servco's Second Amended Complaint alleges the following counts: (1) Recovery of Response Costs under CERCLA § 107, 42 U.S.C. § 9607; (2) Contribution under CERCLA § 113, 42 U.S.C. § 9613; (3) Contribution or Indemnity under Haw. Rev.Stat. § 128D–18(d); (4) Breach of Contract against City Mill; (5) Breach of Warranty and Duty to Defend against City Mill; (6) Declaratory Judgment against Certain Defendants (including Damon Estate); (7) Fraudulent Concealment against Damon Estate, City Mill, Tripler Corporation, Tripler Partnership, and the Tripler Directors; (8) Negligent Non-disclosure against Damon Estate, City Mill, Tripler Corporation, Tripler Partnership, and the Tripler Directors; (9) Failure to Warn of Unreasonably Defective and Hazardous Conditions against Damon Estate, City Mill, Tripler Corporation, Tripler Partnership, and the Tripler Directors; (10) Public Nuisance; (11) Equitable Subrogation; (12) Equitable Indemnity; and (13) Equitable Relief.

In addition to the Damon Estate, Servco named former owners, operators, or lessees of the Property. Defendants Walter Chuck, Francis Weggeland, Ray Lindsey, Kenneth Gatzenmeyer, Hiram Kamaka, and Louis Valier, Jr., ("the Tripler Directors") are former officers and directors of Tripler Corporation, or partners of Tripler Partnership, and are sued in those capacities. Defendants George Kashiwa, Mildred Chang, and Steven Chang ("the Atlas Directors") are former officers or

directors of Atlas Corporation, and are sued in those capacities.

The Defendants in turn filed numerous cross- and counter-claims. In particular, Damon Estate filed an Amended Counter-claim against Servco asserting claims for contractual indemnity, breach of contract, statutory contribution, equitable subrogation, bad faith, and declaratory judgment. Damon also cross-claimed against City Mill, asserting various claims for indemnity, contribution, and breach of leases and assignments.

The present motions primarily concern Count VI (declaratory relief) of Servco's Second Amended Complaint against the Damon Estate; and Counts I–IV (indemnity and breach of contract), VIII (bad faith), and IX (declaratory judgment) of the Damon Estate's Amended Counter-claim against Servco.

By Order dated January 18, 2000, the Court previously denied the Atlas Directors' motion to dismiss. The Court also denied Servco's motion for partial summary judgment against Defendant City Mill on Servco's (1) breach of contract and (2) breach of warranty and duty to defend claims (Counts Four and Five of the Second Amended Complaint). It also denied City Mill's counter-motion for partial summary judgment against Servco on those counts.

## II. BACKGROUND

A. *The Property's History*

The Property consists of lots 1058, 1059 and 1060. Damon Estate owns the fee simple interest. In 1961, Damon Estate leased the Property, along with other lots, to Tripler Warehousing Inc. ("Tripler Corporation") for a fifty-year term. The 1961 lease contained the following relevant clauses:

(4) *Repair and Maintenance.* Lessee will at his own expense, from time to time at all times during said term, well and substantially repair, maintain, amend and keep all buildings, drainage ditches, culverts, tunnels and other improvements now or hereafter built on the land hereby demised with all necessary reparations and amendments whatsoever in *good order and condition.* Lessee will at all times maintain and keep a strip of said premises at least ten (10) feet wide along the boundary of any adjoining street or streets (except for any paved driveway or walkway crossing said strip) in a neat and attractive condition, suitably planted with grass or shrubs and in good condition. *[emphasis added]*

. . . .

(6) *Laws and Ordinances.* Lessee will, during the whole of said term, *keep said premises in a strictly clean and sanitary condition and observe and perform all laws, ordinances, rules and regulations for the time being applicable* to said premises or any buildings and improvements now or hereafter erected thereon or the use thereof; and will indemnify the Lessors and the Estate and effects of said Samuel M. Damon, deceased, against all actions, suits, damages and claims by whomsoever brought or made by reasons of the nonobservance or nonperformance of said laws, ordinances, rules and regulations or of this covenant. *[emphasis added]*

In 1965, Tripler Corporation subleased lot 1060 to Hawaii Wood Preserving Co., Ltd. ("Hawaii Wood"). Hawaii Wood sold its wood-treating business to Defendant Griffin Forest Industries, Inc., in 1968. Griffin ceased operating in 1982 and was dissolved.[1]

---

**1.** Griffin apparently has some relationship to

Osmose, Inc. The relationship is not germane

Meanwhile, on September 23, 1969, Tripler Corporation assigned the 1961 Lease to Tripler Warehousing Co. ("Tripler Partnership"). When Griffin ceased operations, it transferred the premises to Tripler Partnership.

Some fourteen years later, on September 21, 1983, Tripler Partnership, Damon Estate and Atlas Building Materials entered into an agreement (the "Tri–Party Lease") under which (1) Tripler Partnership leased, or subleased, lots 1058 and 1059 to Atlas from February 23, 1982, to February 22, 1992; and (2) Damon Estate (succeeding Tripler Partnership as lessor/sublessor) leased those lots to Atlas from February 23, 1992, until February 29, 2032. The Tri–Party Lease contained substantially similar "Repair and Maintenance" and "Laws and Ordinances" clauses as in the original 1961 Lease.

Tripler Partnership also assigned its leasehold interest in Lot 1060 back to Damon Estate effective (retroactively) on January 1, 1983. The "Partial Assignment of Lease (With Respect to Lot 1060)" contained the following key clause:

> ... the Assignee [Damon Estate] does hereby covenant and agree to and with the Assignor [Tripler Partnership] that it (Assignee) will faithfully observe and perform all of the terms, covenants and provisions therein contained [in the 1961 lease] and on the part of the Lessee to be observed and performed, and will indemnify and save harmless the Assignor [Tripler Partnership] against and from the non-payment of rent and the non-performance and non-observance of said other terms, covenants and provisions.[2]

(Square brackets added; parentheses in original.)

This 1983 transaction is important. The current motions revolve around, among other things, the meaning of that key clause and the effect of lessee Tripler Partnership's assignment of Lot 1060 back to lessor Damon Estate. What was the purpose of the clause? What did Damon Estate agree to do in 1983, and what effect, if any, does that agreement have now? Did the leasehold and fee interests in Lot 1060 merge in 1983? Even if the interests merged, do Damon Estate's agreements in that partial assignment survive? If so, what effect do those agreements have as to current lessee Servco?

On September 7, 1983, Damon Estate leased Lot 1060 to Atlas. Atlas then had all three lots (1058, 1059, and 1060). The September 7th Lease contained identical "Repair and Maintenance" and "Laws and Ordinances" clauses as in the Tri–Party Lease (again, which were substantially similar to those in the 1961 Lease).

Atlas is now a dissolved Hawaii corporation.[3] Defendants George Kashiwa, Lee Tien–Lee Chang, Mildred Chang, and Steven Chang ("the Atlas Directors") are former officers and directors of Atlas. Mildred and Lee Chang, among others, also subleased lots 1058 and 1059 from Tripler corporation or Tripler partnership from the late–1960's until October 5, 1977.

On August 24, 1984, Atlas assigned its interests in the Tri–Party Lease and the September 7th Lease to City Mill, with the consent of Damon Estate and Tripler Partnership. City Mill had the Property.

On September 14, 1984, City Mill executed a Sale and Purchase Agreement un-

---

to the present motions.

**2.** The Tri–Party Lease contained a similar clause regarding lots 1058 and 1059.

**3.** Atlas is no longer a Defendant. It was a named Defendant in previous versions of the complaint, but was not named in the Second Amended Complaint. *See Forsyth v. Humana,* 114 F.3d 1467, 1474 (9th Cir.1997).

der which Servco agreed to buy, among other assets, City Mill's leasehold interests in the Property. Accordingly, on March 1, 1985, City Mill assigned its interests in the Property to Servco.

In short, the current lessee Servco got the 1983 leases in the Property from City Mill, which had gotten them from Atlas. Atlas had gotten the Property from Tripler and Damon as a result of the 1983 tri-party transaction. As set forth earlier, Damon Estate owns the fee interest and is the lessor. The original 1961 Lease currently appears on the Transfer Certificate of Title ("TCT") for the Property (which is land court property).

The operative documents for the current motions are the leases from the 1983 transaction (the September 7, 1983, lease and the Tri–Party lease), which contain substantially similar "Repair and Maintenance" and "Laws and Ordinances" clauses as in the original 1961 Lease. Specifically, the leases contain the following key provisions:

> 6. *Laws and Ordinances.* Lessee will, during the whole of said term, *keep said premises in a strictly clean and sanitary condition and observe and perform all laws, ordinances, rules and regulations for the time being applicable* to said premises or any buildings and improvements now or hereafter erected thereon or the use thereof; and will indemnify the Lessors and the Estate and effects of said Samuel M. Damon, deceased, against all actions, suits, damages and claims by whomsoever brought or made by reasons of the nonobservance or nonperformance of said laws, ordinances, rules and regulations or of this covenant. *[emphasis added]*

> . . . .

> 12. *Indemnity.* Lessee will *indemnify and hold the Lessors harmless from and against all claims and demands for loss or damage, including property damage . . . arising out of or in connection with the use or occupancy of said premises by the Lessee or any other person claiming by, through or under the Lessee* . . . or any failure by the Lessee to keep said premises or sidewalk in a safe condition, and will reimburse the Lessors for all their costs and expenses including reasonable attorneys' fees incurred in connection with the defense of any such claims[.] *[emphasis added]*

The motions also call for interpreting these "compliance" and indemnity clauses (for the most part, the cross-motions deal with differing interpretations of the same language). What are Servco's obligations to Damon? Must Servco indemnify Damon for past contamination?

## B. *Contamination of the Property*

Servco alleges that it first learned of possible contamination of the Property on April 2, 1996. The Property was eventually found polluted with hazardous substances, including chromium, arsenic and pentachlorophenol—constituents of chemicals used to treat lumber against termites. Servco claims to have first discovered an unregistered underground storage tank ("UST") containing those chemicals in 1996. Servco removed the UST in July of 1997. When the UST was removed, it evidently had small holes near the bottom of the tank.[4] Servco contends that the UST was nearly full when it was excavated.[5] Damon contends that chemicals may

---

4. Clayton Environmental Consultants reported as follows: "After removal of the UST, no stained soil was observed within the excavation pit and small holes were observed in the bottom of the UST." *See* Exhibit "G" to Da-

mon Estate's Statement of Facts of April 7, 2000, at 16.

5. Clayton Environmental reported that the UST was "approximately two-thirds full of

have leaked from the UST during both City Mill's and Servco's terms and that this "passive migration" has implications under CERCLA.

It is unclear who contaminated the Property. Most parties point to Hawaii Wood and Griffin, who operated a wood-treatment facility on the Property in the mid–to–late–1960's (when Tripler was the lessee and Hawaii Wood and Griffin were sub-lessees). Damon contends, via an expert's affidavit, that it is premature to conclude that the wood treatment facility is the only source of contamination. There is some indication that City Mill stored and sold wood products on the Property, although no evidence that it *treated* wood there. Damon also has produced some evidence indicating that Servco might have known, or had reason to know, about the UST earlier than 1996.

The record contains evidence that Servco excavated and backfilled part of Lot 1060 in the mid-to-late 1980's during construction related to a sewer line. Also, in 1986 Servco installed (and later removed in 1997) via a contractor an oil/water separator and a 100–gallon oil storage tank on Lot 1060. It also constructed a loading ramp and driveway in 1996. This construction involved excavation of soil (although there is disagreement over whether the soil was removed or spread to other areas of Lot 1060). It was apparently while this loading ramp and driveway were constructed that Servco discovered the UST that contained wood-treating chemicals.

Further testing of the contamination at the Property is planned (or was planned at the time of the hearing).

## III. DISCUSSION

### A. Servco's Motion for Partial Summary Judgment

Servco seeks a declaration that (1) Damon Estate assumed the duty to remediate the property in 1983; (2) Servco is not contractually obligated to clean up pollution caused by .others; (3) Servco is not obligated to defend or indemnify Damon Estate under the terms of the 1983 leases; and (4) Servco did not waive or release any claims against the Damon Estate.

### 1. The effect of the 1983 Lot 1060 assignment by Tripler back to Damon Estate.

The Court must first determine the effect of the following clause from the 1983 partial assignment of Lot 1060:

... the Assignee [Damon Estate] does hereby covenant and agree to and with the Assignor [Tripler Partnership] that it (Assignee) will faithfully observe and perform all of the terms, covenants and provisions therein contained [in the 1961 lease] and on the part of the Lessee to be observed and performed, and will indemnify and save harmless the Assignor [Tripler Partnership] against and from the non-payment of rent and the non-performance and non-observance of said other terms, covenants and provisions.

Servco asserts that when Damon Estate agreed to "observe and perform all of the terms, covenants, and provisions" in the 1961 lease (including the "repair and maintenance" clause), Damon Estate agreed to remediate the property. This agreement to "repair and maintain," so Servco's argument goes, included environmental problems that were caused by Damon's *past*

residual sludge/soil that were stained green." *See supra* note 4, at 1189. We don't know, of course, whether the tank was always 2/3rds full or if it was completely full and leaked 1/3rd of the contents. One can speculate either way.

lessees or tenants, i.e., Tripler Partnership and its sublessees. Servco effectively contends that, because the property was apparently contaminated by Tripler's sublessee Griffin (the wood treatment company) in the 1960's, Damon is solely responsible for the environmental clean-up of Lot 1060.[6]

a) Damon's estoppel certificate

■ Initially, regarding all pending motions, Servco points to an estoppel certificate that Damon issued to Servco's lender First Interstate Bank in 1986. Servco also refers to positions Damon took in lease rent negotiations it had with Damon for the 1992 to 2002 period. In the estoppel certificate, Damon represented to First Interstate that Servco's 1983 leases were "in full force and effect" and that Servco was "not in default." Similar representations were made in the rent negotiations. Servco contends that Damon is therefore estopped from now arguing that Servco is or was in "breach" of the terms of the 1983 lease.

This is a curious argument. Servco received the *benefit* of Damon's estoppel certificate as it obtained financing from First Interstate. First Interstate—not Servco—relied on the certificate which indicated that Servco was not in breach. Surely Servco is not saying that Damon should have told First Interstate that Servco *was* in breach. As such, the Court is unpersuaded that Damon is estopped from arguing that Servco is or was in breach. *Cf. NHS National Health Services, Inc. v.*

*Kaufman,* 250 A.D.2d 528, 673 N.Y.S.2d 129, 130 (1998); *Sohmer Factors Corp. v. 187–20 Tioga Drive Corp.,* 9 Misc.2d 862, 169 N.Y.S.2d 557, 561 (1957). If anything, under the current record and given presently open factual issues regarding Servco's notice (whether actual or constructive) of contamination, Servco is estopped from arguing that Damon is estopped. *Cf. Kam Chin Chun Ming v. Kam Hee Ho,* 45 Haw. 521, 563, 371 P.2d 379, 404 (1962) ("He who seeks equity must do equity"); *In re Gardenhire,* 209 F.3d 1145, 1152 n. 11 (9th Cir.2000) (same). Likewise, the Court is not persuaded that Damon's representations made during rent negotiations should estop it from now asserting that Servco is in default.

b) Merger

■ Damon responds to Servco's arguments regarding the meaning of the language in the 1983 assignment in two ways. First, it contends that the lease and fee interests in Lot 1060 merged in 1983. How could Damon be both lessee and lessor, and thereby promise to itself to comply with the terms of its 1961 lease? Second, even if the interests did not merge, or if the promises in the partial assignment otherwise survive, Damon contends that the parties (Tripler Partnership and Damon) intended the agreement to apply only to the remaining term of the 1961 lease, i.e., the future—not the past.[7]

Although Damon Estate had both the fee and lease interests in Lot 1060 after

---

**6.** The UST was found on Lot 1060, although the leakage might have spread to Lots 1058 and 1059.

**7.** Servco—not Tripler—is moving for partial summary judgment. Tripler has essentially taken no position here in the current battle between Servco and Damon; it has, however, filed documents arguing that there was no merger. Tripler contends that the clause survives (and thus Damon Estate has a duty to "indemnify and save harmless" Tripler against violations of the 1961 lease, presumably including the subject environmental dispute). Nevertheless, Servco has standing to raise the 1983 assignment clause either (1) on a third-party beneficiary theory, or (2) because such a ruling could obviate Servco's present contractual responsibility for the clean-up.

1983, "the doctrine of merger is not favored either at law or equity." 3 Milton R. Friedman, *Friedman on Leases,* § 39.1, at 1865 (4th ed.1997). "[A]s between landlord and tenant, merger has been denied where its effect would, probably unintentionally, prejudice either of them." *Id.* at 1867. Hawaii follows this modern theory. *See State Savings & Loan Association v. Kauaian Development Company,* 50 Haw. 540, 555, 445 P.2d 109, 120 (1968) ("Courts of equity have consistently refused to permit estates to merge where the effect would be to impair the rights of third parties, or where there is any reason to keep the estates separate").

Ultimately, however, the Court need not decide whether the interests merged. That question is largely moot (although it is likely that the interests did not merge) because even if the estates merged, the promises in the partial assignment that benefitted Tripler Partnership would still survive. In *State Savings,* the Hawaii Supreme Court reasoned as follows:

> We do not go so far as to reject completely the common law doctrine of merger. We do, however, refuse to apply it [to] defeat the legally enforceable rights the purchasers obtained by virtue of their contracts.

*Id.*

Thus, whether Tripler "assigned" or "surrendered" the property back to Damon, the rights that Tripler obtained in the 1983 assignment of Lot 1060 (e.g., indemnification, promises to perform lease covenants) were not extinguished by the doctrine of merger. The more difficult question is the precise meaning of the clause.

### c) The meaning of the indemnity clause

CERCLA contains a provision addressing the permissibility of contractual indemnification clauses:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1).

Section 9607(e)(1) "does not frustrate public policy as expressed in CERCLA" because "all responsible parties would remain fully liable to the government, although they would be free to enter into private contractual arrangements" that are tangential to enforcing CERCLA. *Jones–Hamilton Co. v. Beazer Materials & Services, Inc.,* 973 F.2d 688, 692 (9th Cir.1992) (citing *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1459 (9th Cir.1986)). Essentially, you cannot escape CERCLA liability via an indemnity agreement, although you can obtain contractual protection or reimbursement. "[T]he indemnified party continues to remain fully liable ...; [it] just has someone to share the expense with." William B. Johnson, Annotation, *Indemnification or release agreement as covering liability under § 107(e) of Comprehensive Environmental Response, Compensation, and Liability Act,* 139 A.L.R. Fed. 123, 139, 1998 WL 4130 (1997).

█ Servco asserts that in 1983 when Damon Estate took back the lease interest in Lot 1060 from Tripler Partnership, Damon Estate agreed affirmatively to remediate the property, i.e., clean-up *past* environmental problems, and "indemnify and save harmless" Tripler for those past breaches. Essentially, Servco contends that Damon Estate agreed to indemnify Tripler for Tripler's breaches.

Servco's argument fails. The agreement was only for the *future*, i.e., the remainder of Tripler's term of the 1961 Lease. There is no language in the clause referring to *past* Tripler breaches or specifically to environmental problems. *See, e.g., Straub Clinic & Hospital, Inc. v. Chicago Ins. Co.*, 4 Haw.App. 268, 273, 665 P.2d 176, 179–80 (1983) ("Contracts of indemnity are strictly construed, particularly where the indemnitee [e.g. Tripler] claims that it should be indemnified against its own negligence"); *Beazer East, Inc. v. Mead Corporation*, 34 F.3d 206, 211 (3d Cir.1994) (indemnity clause would not cover CERCLA claim against indemnitee's own violation unless it either (1) specifically includes CERCLA liability, or (2) is general enough to include all environmental liabilities) (Alabama law). *See also Fina, Inc. v. ARCO*, 200 F.3d 266, 273 (5th Cir.2000) (purpose of "clear and unequivocal test" is to ensure that indemnitors are "fully cognizant of the extraordinary risks that they are assuming") (Delaware law).

Moreover, the language of the clause refers to 1961 lease terms or covenants "*to be* observed and performed"—plainly referring to the future. Tripler Partnership was returning a long-running lease (the 1961 lease) to the lessor; the clause was meant to cover the remainder of Tripler's term.

Accordingly, Damon Estate did not agree to remediate or indemnify for past breaches because the 1983 assignment does not "clearly and unequivocally" assume either general environmental liability or the indemnitee's (Tripler's) past breaches. *See also Kamali v. Hawaiian Electric Co.*, 54 Haw. 153, 162, 504 P.2d 861, 866 (1972). Damon agreed with Tripler—not Servco—that Damon would comply with the 1961 lease post-reassignment and indemnify Tripler if it did not.

**2. Servco's obligations to Damon in the 1983 leases (as distinct from the Tripler/Damon assignment) regarding Lot 1060.**

██ Servco seeks a declaration that it is not obligated to defend, indemnify or protect Damon, and that it is therefore not in breach of lease obligations. This brings up the compliance and indemnity clauses of the 1983 leases that Servco received from City Mill in which Servco stepped into the shoes of the "lessee."

a) The indemnity clause in the 1983 leases

The first question here is whether Servco must "indemnify and hold harmless" Damon for the CERCLA problems for pollution occurring before Servco leased the Property. Damon contends that the 1983 leases plainly require Servco to "indemnify and hold [Damon] harmless from and against all claims and demands for loss or damage … arising out of or in connection with the use or occupancy of [lot 1060] by [Servco]." Damon (now claiming to be an indemnitee) is arguing for a different interpretation of the indemnity provisions of the 1983 leases than it earlier argued for with the indemnity provision in the Tripler assignment (where Damon is the indemnitor).

The indemnity language between the two provisions is slightly different. The indemnity provisions in the 1983 leases contain language regarding "use and occupancy," whereas the Tripler provision refers generally to "non-performance and nonobservance of said other terms, covenants and provisions [of the 1961 lease]." [8]

8. Again, the Tripler provision in the partial assignment stated:

... the Assignee [Damon Estate] does hereby covenant and agree to and with the Assignor [Tripler Partnership] that it (Assignee) will faithfully observe and perform all of the terms, covenants and provisions therein contained [in the 1961 lease] and on

Nevertheless, for present purposes, the Court finds the provisions to be substantially similar and will interpret them consistently. What was helpful to Damon as to Tripler is harmful as to Servco.

Thus, the Court concludes that the indemnity provisions in the 1983 leases do not require Servco to indemnify Damon for the CERCLA problems at issue, to the extent they are based on pollution occurring before Servco leased the Property. The indemnity language did not refer to CERCLA in particular or to past environmental problems in general. The language did not "clearly and unequivocally" provide for the indemnitor (Servco) to indemnify the indemnitee (Damon) against past CERCLA liability. The language did not specifically state that Servco would indemnify Damon against Damon's wrongful acts. *See Keawe,* 65 Haw. at 237, 649 P.2d at 1153; *Straub Clinic & Hospital,* 4 Haw.App. at 273, 665 P.2d at 179–80; *Beazer East,* 34 F.3d at 210; *Fina,* 200 F.3d at 273. In this regard, the Court agrees with Servco that California cases such as *Brown v. Green,* 8 Cal.4th 812, 35 Cal.Rptr.2d 598, 884 P.2d 55 (1994) and *Jones–Hamilton v. Beazer Materials & Services,* 973 F.2d 688, 692 (9th Cir.1992) do not apply in this regard because California follows a different test than Hawaii for analyzing similar indemnity clauses.

■ The issue is slightly different if Servco itself violated CERCLA during its term (i.e., *after* it acquired the 1983 leases from City Mill). The language "all claims" arising out of Servco's "use or occupancy" is broad enough to include CERCLA claims based upon Servco's violations (although not to cover an indemnitee's own negligence). *See Fina,* 200 F.3d at 270 (reasoning that even though indemnity provision was broad enough to cover CERCLA, it did not cover indemnitee's own negligence).

However, as for any *post*–1985 contamination or CERCLA violations by Servco, presently there are genuine disputes over material questions of fact. These factual disputes include (1) whether the pollution was caused entirely by wood treatment operations,[9] (2) when the pollution occurred, (3) whether there was leakage from the hole in the UST, and (4) whether Servco "disposed" of or "released" pollution, or otherwise violated CERCLA, by excavating and removing contaminated soil in 1986 or 1996.

The hole is not a red herring—at least on the current record—because, even assuming the tank was "nearly" full when it was removed (as Servco argues), it still could have leaked significant amounts of chemicals. Although there is some dispute, the tank apparently stored the very chemicals that comprise the majority, if not all, of the contaminants at issue. If the tank leaked, did the leakage constitute a "disposal" or "release" for CERCLA

the part of the Lessee to be observed and performed, and will indemnify and save harmless the Assignor [Tripler Partnership] against and from the non-payment of rent and the non-performance and non-observance of said other terms, covenants and provisions.

And the indemnity provision from the 1983 leases stated:

Lessee will indemnify and hold the Lessors harmless from and against all claims and demands for loss or damage, including property damage ... arising out of or in connection with the use or occupancy of said premises by the Lessee or any other person claiming by, through or under the Lessee ... or any failure by the Lessee to keep said premises or sidewalk in a safe condition, and will reimburse the Lessors for all their costs and expenses including reasonable attorneys' fees incurred in connection with the defense of any such claims[.]

9. *See* Declarations of Peter Mesard of April 7, 2000, and April 20, 2000.

purposes? Moreover, there are the factual issues regarding the extent and scope, if any, of "grading" or "excavation and backfill" of contaminated soil.

In short, if Servco "polluted" the Property while it was a lessee, it must indemnify Damon and "hold it harmless." The Court cannot yet, at this summary judgment stage and under the current record, find that Servco did not in some manner contribute to the pollution.

#### b) The compliance clause

The compliance clause analysis follows the same logic. Contractually, Servco must keep the Property "in a strictly clean and sanitary condition and observe and perform all laws, ordinances, rules and regulations." Servco is not in breach of the clause: No one disputes that Servco is in fact currently complying with CERCLA by remediating the property. The fight here is over allocating the responsibility and the cost. The clause does not require Servco—contractually—to remediate for *past* breaches. (Servco might, however, have such an obligation under CERCLA.) [10]

A related question is whether Servco as a lessee is complying (1) because it is a "Potentially Responsible Party" ("PRP")

as a current "owner or operator," or (2) because it owned or operated that property when hazardous substances were "disposed" of. *See* Sections 9607(a)(1) & (2). That question is the subject of Damon Estate's counter motion.

#### B. *Damon Estate's Counter Motion*

Damon seeks the following: (1) A ruling that Servco is strictly liable under CERCLA as an "owner" or "operator"; (2) dismissal of Servco's claim for recovery of response costs (Count I); (3) a ruling that under the 1983 leases Servco is required to indemnify it for CERCLA liability; [11] and (4) dismissal of Servco's contribution claim against it based upon the indemnity clauses in the 1983 leases.

#### 1. Is Servco a CERCLA PRP?

CERCLA imposes strict liability (subject to certain defenses) on four classes of PRPs:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

---

10. The Court acknowledges a circular relationship between (1) whether a "compliance clause" is valid and alone requires a current lessee to clean-up past pollution, and (2) whether CERCLA requires particular acts in order to be in compliance. If complying with CERCLA requires remediating for past pollution, and if a contract also requires one to comply with CERCLA, then logically if one fulfills its contractual obligation it will also remediate past pollution.

   Although Servco is not necessarily required to remediate for past pollution because of the *contractual* provision (the compliance clause) Servco *might* be required to remediate (subject to contribution from others) as a matter of federal law *if* it is ultimately determined to be a PRP with no defenses. But, any require-

ment to remediate the property would be based upon CERCLA, not necessarily upon the agreement by Servco to keep the property "in a strictly clean and sanitary condition" or to "observe and perform all laws"—especially for pollution occurring before Servco took possession. Servco would have to comply with CERCLA *regardless* of that particular compliance clause.

   Just because Servco must comply with the law does not mean Damon may not. Again, the clause does not allow Damon to shift all CERCLA liability to others. *See* 42 U.S.C. § 9607(e)(1).

11. The third question is already answered based upon the rulings on Servco's motion. Servco must only indemnify Damon for CERCLA violations Servco caused.

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another ... entity and containing such hazardous substances, and

(4) any person who ... accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance....

42 U.S.C. § 9607(a).

Damon seeks dismissal of Count I of the Second Amended Complaint ("Recovery of Response Costs—CERCLA § 107, 42 U.S.C. § 9607") because it contends that Servco is a CERCLA PRP. If Servco is a PRP, Servco cannot proceed on a CERCLA cost recovery action, but would primarily be proceeding for contribution. *See Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1306 (9th Cir.1997) (holding that a CERCLA claim by one PRP against another PRP necessarily is one for contribution under § 9613(f) rather than a response cost action under § 9607); *Bedford Affiliates v. Sills*, 156 F.3d 416, 424 (2d Cir.1998) (holding the same, citing cases from the Third, Fourth, Tenth and Eleventh Circuits). Ultimately, this could make a difference in determining whether or not there is possible joint and several liability among certain Defendants.

a) PRP status as a lessee

■ As set forth earlier, Servco is the current lessee of the Property. It obtained long-term 50–year leases from City Mill in 1985. The Court finds as a matter of law that Servco maintains sufficient control and possessory interests in the Property to be an "owner" (and "operator") as those terms are defined and interpreted in CERCLA. *See* 42 U.S.C. § 9601(20)(A) (defining terms); *Long Beach Unified Sch. Dist. v. Godwin Liv. Trust*, 32 F.3d 1364, 1368 (9th Cir.1994) (interpreting statute); *Commander Oil Corp. v. Barlo Equipment Corp.*, 215 F.3d 321, 330–31 (2d Cir.2000) (describing possible factors that might "transform a lessee into an owner").

■ Similarly, Damon Estate as the fee simple owner is an "owner" for purposes of section 9601(20)(A). Damon is a CERCLA PRP as a matter of law. *See Long Beach*, 32 F.3d at 1368 (reasoning that the circular definition of "owner" implies that the term is read according to its plain and ordinary meaning rather than technically). No one disputes this, and Damon necessarily admits it in arguing the applicability of *Pinal Creek*.

b) PRP status under section 9607(a)(2)

■ Although Servco is a PRP as a current owner under section 9607(a)(1) (subject to the innocent landowner defense), the statute does not preclude it from also being a PRP under section 9607(a)(2) as a person who "owned or operated" the Property when a "disposal" occurred.

CERCLA defines "disposal" by referring to the definition in section 1004 [42 U.S.C. § 6903] of the Solid Waste Disposal Act (which includes the Resource Conservation and Recovery Act of 1976) ("RCRA"). *See* 42 U.S.C. § 9601(29). In turn, RCRA defines "disposal" as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged

into any waters, including ground waters.

42 U.S.C. § 6903(3).

The Ninth Circuit sitting en banc in *Carson Harbor Village, Ltd. v. Unocal Corporation,* 270 F.3d 863 (9th Cir.2001) (en banc), *Petition for Certiorari Filed,* 70 USLW 3481 (Jan 22, 2002) (No. 01–1091), addressed whether "passive migration" could constitute a "disposal" for purposes of section 9607(a). The gist of *Carson Harbor* is that it depends. The Ninth Circuit concluded that "disposal" does *not* include general gradual passive migration of contamination through the soil. *Id.* at 879. However, the decision concluded (or strongly implied) that passive gradual "leaking" such as that from an underground storage tank with a hole in it or from an abandoned barrel would constitute a "disposal." *Id.* at 879, 881, 885–86.

Therefore, after the en banc decision in *Carson Harbor,* Servco could also be a PRP under section 9607(a)(2) as an owner when a "disposal" occurred. The "disposal" would be the leaking UST, but not other passive migration of contaminants. It is, however, premature to conclude as a matter of law that the UST did in fact leak during anyone's tenure. This is a disputed factual issue. If it did leak, then Servco would be a PRP both as an owner under 9607(a)(1) and 9607(a)(2) (as would Damon Estate).[12]

c) The "innocent landowner" defense

■ Even if Servco is a current "owner" as CERCLA and corresponding case law define the term, Servco contends that it is not liable as a PRP under the "innocent landowner defense." *See* 42 U.S.C.

§ 9607(b)(3) (establishing CERCLA defense for damages caused solely by others in connection with certain "contractual relationships"); § 9601(35) (defining "contractual relationship" for purposes of section 9607(b)(3) to include land contracts whereby current owner acquired polluted property); *United States v. 150 Acres of Land,* 204 F.3d 698, 703–04 (6th Cir.2000) (discussing innocent landowner defense).

■ Under this defense, present owners such as Servco are liable for clean-up costs *unless:*

(1) they can establish by a preponderance of the evidence that the "release" of the substances and the damages resulting from the release were caused *solely* by an act or omission of a third party who was neither

   (a) the present owners' employee nor
   (b) someone who was in a contractual relationship with the owners;

*and*

(2) the owners
   (a) exercised due care with respect to the substances, in light of all relevant facts and circumstances, and
   (b) took precautions against the foreseeable actions and omissions of third parties.

*150 Acres of Land,* 204 F.3d at 703–04 (emphasis in original). That is, "[p]resent owners [such as Servco] who acquired their interests by land contracts, deeds, or other instruments transferring title or possession ... must ... have undertaken 'all appropriate inquiry' when they acquired the property to avoid liability." *Id.* at 704.

It is premature to determine as a matter of law that Servco is an "innocent landown-

---

**12.** In any event, the "disposal" from a leaking UST is not dispositive on this issue because, as to Servco, there is a dispute of fact as to whether it otherwise actively "disposed" of contaminants by excavating, backfilling, or spreading substances in the soil in the 1980's

and 1990's when it constructed and installed the sewer line, oil storage tank, and loading ramp. That is, Servco might be a PRP under section 9607(a)(2) regardless of the tank. Again, however, this is a disputed question of fact.

er" for purposes of section 9607(b)(3). In the present motions the parties have not focused on Servco's level of inquiry during the City Mill transaction wherein it obtained the Property (and the record contains no evidence in this regard on an issue where Servco would have the burden). Whether Servco undertook "all appropriate inquiry" remains a question of fact. Moreover, as discussed earlier, whether the "release" was caused solely by someone other than Servco is also in dispute.

The en banc court in *Carson Harbor* noted, but specifically left open, the question whether a party who is a PRP *both* under section 9607(a)(1) *and* 9607(a)(2) may still assert the innocent landowner defense. *See* 270 F.3d at 883 n. 10. This Court will not address this question here because, again, the present motions do not deal specifically with Servco's innocent landowner defense.

It may well be that such a "dual status" PRP could assert the defense to the extent contamination resulted *before* it acquired the property, but not for contamination occurring after. Assuming costs or contamination were allocable, such a PRP could seek cost recovery for prior contamination, but only seek contribution for post-acquisition contamination. Nevertheless, even if the defense were not available at all, questions of fact regarding Servco's status prevent a ruling at this time. This should be a subject of separate briefing and more indepth research.

Thus, the Court cannot dismiss Count I against Damon on the present record. If Servco is indeed an "innocent landowner" then it might be able to proceed with a section 9607 cost recovery action—at least as to contamination occurring before Servco acquired the property—against Damon as stated in Count I. *See PMC, Inc. v. Sherwin–Williams Company,* 151 F.3d 610, 617 (7th Cir.1998) ("an innocent landowner can also sue under section [9607]")

(citing cases). Likewise, the Court cannot dismiss Servco's contribution claim against Damon.

### C. *City Mill's Joinder*

City Mill joins in Servco's motion against Damon Estate, seeking a ruling that it is not a CERCLA PRP under either section 9607(a)(1) or (2). It therefore asks for partial summary judgment as to the relevant indemnity counts of Damon's cross-claim.

No one seriously disputes that City Mill is not an "owner" or "operator" as set forth in section 9607(a)(1). That section refers to *current* owners or operators. *See Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.,* 976 F.2d 1338, 1341 (9th Cir.1992). City Mill currently has no traditional ownership interest in the Property. City Mill exerts no control over the Property. Although there apparently is a pending rescission claim by Servco against City Mill, City Mill is not currently an owner. City Mill is not a PRP as set forth in section 9607(a)(1).

Damon, however, asserts that there is a question of fact regarding whether City Mill is a PRP as a prior owner under section 9607(a)(2) because it might have "disposed" of hazardous substances when City Mill "owned or operated" the Property in 1984–85. It bases its contention on two possible theories of "disposal."

First, Damon asserts a "passive migration" theory. Damon points to the UST with the hole in the bottom. If contaminants were leaking from the hole when City Mill leased the property (even if City Mill did not know of the UST), then Damon contends that the chemicals were "passively migrating" and thus City Mill should be deemed to have "disposed" of the chemicals while it "owned or operated" the Property. *See Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 840 (4th Cir.1992) ("the statute plainly imposes

liability on a party who owns a facility at the time hazardous waste leaks from an underground storage tank on the premises"); *Joslyn Manufacturing Co. v. Koppers Company, Inc.*, 40 F.3d 750, 762 (5th Cir.1994) ("to be found liable under the CERCLA statutory scheme, a former owner must have owned the property during a period when a disposal occurred").

Second, Damon contends that City Mill may have otherwise disposed of some hazardous chemicals during the four-month period when it operated a retail store on the Property.

### 1. The "passive migration" theory as to City Mill

As with Servco, after the en banc decision in *Carson Harbor*, City Mill might be a PRP under section 9607(a)(2) *if* the UST on lot 1060 leaked while it "owned" the Property. City Mill could not, however, be such a PRP as a past owner to the extent such status was based upon "passive soil migration" of contaminants *after* they may have leaked from the tank (e.g., from lot 1060 to 1058 or 1059).

City Mill argues that Servco has not produced evidence that the tank leaked while City Mill had an interest in the Property back in 1984 or 1985, and that it should not have the burden to prove that the tank did *not* leak. But Servco does have evidence that suggests the tank might have leaked in the past. Whether Servco can *prove* it leaked during someone else's tenure is a different question. Perhaps it did not leak during City Mill's tenure (or perhaps not at all), but at summary judgment the Clayton Environmental report is enough to raise a factual issue. (The argument that the tank did not leak could prove too much. No one seriously disputes that the Property—at least lot 1060—is polluted. If the tank did not leak, then the contamination must have come from something else: wood treatment operations, spillage, cutting, storage, leaching from dumpsters etc.)

In short, however, there are material questions of fact as to whether City Mill is a PRP under section 9607(a)(2). It is premature to declare that City Mill is not a PRP as a past owner.

### 2. City Mill's Use of Lot 1060

Alternatively, Damon contends that City Mill might otherwise have "disposed" of pollutants when it handled treated lumber on the Property. The record reflects that City Mill operated a retail hardware store for about four months in the mid–1980's. It was the actual lessee for only about six months (Atlas assigned its interests to City Mill on August 24, 1984, and City Mill then assigned its interests to Servco on March 1, 1985).

Damon cites to the declaration of its environmental expert, Peter Mesard, who opined that City Mill "stored, handled, and processed (e.g., cut, sawed and possibly planed) lumber treated with chemicals containing [pentachlorophenol] and chromated copper arsenate ('CCA') during City Mill's use of the Property." He observes that soluble chemicals could leach from CCA-treated wood exposed to rainwater and therefore could have contributed to the contamination.

City Mill counters with a declaration of Earl Wataoka (the store manager at the time) as well as deposition and declaration testimony of Elizabeth Norcross (City Mill's controller and corporate representative) to the effect that City Mill could not have contaminated Lot 1060. According to this testimony, City Mill did not treat lumber with any chemical on the Property. Treatment was done elsewhere. Any cutting of treated lumber occurred on Lots 1058 or 1059, and would have occurred inside the building. Any storage of treated lumber was on the "front" of Lot 1060—away from the contaminated area.

Any stored lumber on the "rear" of Lot 1060 was in a shed. Contamination by, say, treated sawdust would appear to be minimal.

City Mill's factual evidence is undisputed. Damon's evidence offered in opposition is not factual; its environmental expert was not there in 1984 or 1985. The Court is therefore inclined to rule that City Mill is entitled to summary judgment on the cross-claim. Damon, however, has moved under Fed.R.Civ.P. 56(f) for additional time to take discovery into factual issues regarding City Mill's storage or treatment of lumber on the Property. The Court will allow Damon additional time for such discovery (e.g., inquiry into where treated lumber was stored). Moreover, further environmental testing of the Property is apparently contemplated or ongoing. If Damon is unable to create a genuine issue of material fact, then the Court will revisit this issue upon the appropriate motion. In any event, even if City Mill's lumber-cutting activities contributed to the pollution, it appears that its equitable share of the harm would be minimal (at least on the current record).[13] City Mill's motion as to Damon is denied without prejudice.

### D. *The Individual Atlas Defendants*

The individual Atlas Defendants (Mildred M.Q. Chang, Steven H.K. Chang, Louis L.C. Chang, and George Chen Yang Wang) have a meritorious argument that, after the en banc decision in *Carson Harbor*, they should not be considered PRPs—at least to the extent such status stems from the (assumed) leaking UST and subsequent migration of contaminants from lot 1060 to lots 1058 and 1059.

The undisputed evidence is that the individual Atlas Defendants never had an ownership (leasehold or otherwise) interest in lot 1060, on which the UST was found. Although they did have interests in lots 1058 and 1059, they never "owned" the UST or the lot on which it was found. *See* Atlas Defendants' Response of Dec. 10, 2001 at 4 n. 2 and 7 n. 5. Thus, after the en banc decision in *Carson Harbor*, they cannot have been owners when a "disposal" took place (based upon the assumed leaking UST) because migration of contaminants on their lots does not constitute a "disposal." Moreover, they did not "operate" the UST. If the pollution was caused completely by the leaking UST, they cannot be PRPs.

It is, however, premature to absolve them completely from possible PRP status. As Servco and Damon Estate point out, there are presently questions of fact as to the source of the pollution. Wood treatment operations or storage or runoff from dumpsters during Atlas' tenure on all three lots remain—at least on the present record—possible sources of contaminants. Such possible status is independent of the UST. As with City Mill, while it might be likely that the Atlas Defendants' ultimate equitable share of the harm could be minimal, there are still questions of fact remaining that prevent summary judgment in their favor at this time.

### IV. CONCLUSION

For the foregoing reasons, the present motions are GRANTED in part and DENIED in part.

IT IS SO ORDERED.

---

**13.** City Mill might still face contractual issues as to Servco, as set forth in the Court's Order of January 18, 2000.